OSCN Found Document:FREDERICK v. STATE

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 FREDERICK v. STATE
2017 OK CR 12
Case Number: D-2015-15
Decided: 05/25/2017
DARRELL WAYNE FREDERICK, Appellant, v. THE STATE OF OKLAHOMA, Appellee.

Cite as: 2017 OK CR 12, __ __

 

OPINION
LUMPKIN, PRESIDING JUDGE:
¶1 Appellant Darrell Wayne Frederick was tried by jury and convicted of First Degree Malice Murder (Count I) (
21 O.S.2001, § 701.7(A)), Assault and Battery with A Dangerous Weapon, After Former Conviction of Two or more Felonies (Count II) (21 O.S.2001, § 645), and Domestic Abuse Assault and Battery (Count III) (21 O.S.2001, § 644 (C)), Case No. CF-2011-1946, in the District Court of Oklahoma County. In Count I, the jury found the presence of three aggravating circumstances: 1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; 2) the murder was especially heinous, atrocious and cruel; and 3) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, and set punishment at death. In Counts II and III, the jury recommended imprisonment for twenty-five (25) years and one year, respectively. The trial judge sentenced Appellant in accordance with the jury's determination and ordered all sentences to run consecutively. Appellant now appeals his convictions and sentences.[1] 
¶2 On March 26, 2011, between 5:30 and 6:30 p.m., Da'Jon Diggs arrived at the home of her grandmother, Connie Frederick (hereinafter referred to as the deceased). The deceased was 85 years old and had been deaf and mute her entire life. She lived in the same house in northeast Oklahoma City in which she had raised six children. Ms. Diggs attended college in another city but frequently stopped by to check on the deceased. Ms. Diggs, like much of her family, communicated with the deceased through sign language. Also living at the deceased's home at the time was Appellant, her fifty-five (55) year old son. He had been living with the deceased since his release from prison in 2009.

¶3 Ms. Diggs entered the home to find Appellant and the deceased "fussing" in the kitchen. Ms. Diggs later explained that despite being mute for speech purposes, the deceased could still make some sounds and was "yelling" at Appellant through guttural noises and sign language involving exaggerated movements with her hands. Ms. Diggs saw Appellant aggressively grab food out of the deceased's hands. Appellant called the deceased a "bitch" and told her to get out of the kitchen. He then shoved her against the kitchen counter. Ms. Diggs intervened and took the deceased to her bedroom, where she was able to calm her.
¶4 Meanwhile, Appellant had retreated to his own bedroom. When Ms. Diggs returned to the kitchen to get the deceased a drink of water, Appellant appeared and told her not to take anything to the deceased. Ms. Diggs ignored this warning and took something to eat and drink to the deceased. The deceased wanted juice instead of water and tried to go to the kitchen. However, Appellant prevented her from entering the kitchen. Ms. Diggs then volunteered to go to the store for some juice.
¶5 While out of the house, Ms. Diggs phoned both her mother, who lived out of state, and her uncle, Tobias Frederick, to discuss her frustrations with Appellant. Both were the deceased's children and Tobias Frederick was an Oklahoma City Police Officer. Ms. Diggs told both her mother and her uncle that she was afraid Appellant would seriously hurt her or the deceased. When Ms. Diggs returned to the house, she heard Appellant answer the phone. Ms. Diggs was able to determine that it was her uncle Tobias that had called. He told Appellant that he had to leave the deceased's home and find another place to live. Appellant replied angrily, "man, I ain't got time for this" and hung up the phone. Ms. Diggs could hear Appellant yelling into the phone. Ms. Diggs headed for the deceased's bedroom and told her to stay in the bedroom no matter what happened. Ms. Diggs then shut the bedroom door.
¶6 Ms. Diggs headed into another room to retrieve her phone and call police when Appellant charged at her yelling, "oh, you have a problem with me too? I'll take you bitch." Appellant attacked Ms. Diggs, shoving her against the wall. The struggle moved from room to room with Diggs attempting to defend herself. Eventually, she was able to push Appellant off of her, causing him to stumble and she ran out of the house. Appellant chased after her.
¶7 Outside, neighborhood kids were playing. Seeing Appellant chase after Ms. Diggs, they shouted at her that Appellant had a brick or rock in his hand. Appellant chased Ms. Diggs around the yard, waving the brick or rock at her. Ms. Diggs ran to the neighbor's home and borrowed a phone to call the police. Appellant, who was dressed only in pajama pants, shouted at the neighborhood children and ran inside the house. He returned a few minutes later, fully dressed. By the time police arrived, Appellant had run around the back of the house. Bystanders heard the rattle of a chain link fence and Appellant was not seen or heard from the rest of the day.
¶8 Ms. Diggs followed police into the deceased's home. They found the deceased lying face down on the floor in her bedroom. The deceased had severe bruising and swelling on both sides of her head to the extent that one eye was nearly swollen shut. When asked who injured her, the deceased signed the letter "D" which she used to identify Appellant. The deceased was taken to the hospital. Once there, she was immediately operated on to reduce the pressure in her brain. She had developed a significant subdural hematoma on the left side of her skull. The deceased survived the surgery but never regained consciousness. She passed away two to three weeks later. The cause of death was listed as blunt force trauma to the head.
¶9 Appellant was located a day after the deceased's beating. He was found walking along the street approximately three blocks from the deceased's home. When approached by police, he initially gave a false name but soon admitted his identity. His right hand was significantly swollen and his right finger was cut and bleeding. There was blood on his clothes. Bloodstains were also found in his bedroom at the decedent's home. Further facts will be set forth as necessary.
JURY SELECTION
¶10 In his first three propositions of error, Appellant asserts that he was denied a fair and impartial jury in several ways during jury selection. In Proposition One, Appellant asserts he was denied his state and federal constitutional rights to due process by the trial court's denial of his request to remove seven specific potential jurors for cause. Shortly before the exercise of the peremptory challenges, the defense moved to excuse for cause prospective jurors (hereinafter known by their initials) M.S., J.L.W., T.S., S.S., D.M., J.W., and J.S. The trial court denied the request as to each potential juror. Defense counsel later used peremptory challenges to remove all but one of these prospective jurors. The State used a peremptory challenge to remove potential juror J.S.
¶11 "In order to properly preserve for appellate review an objection to a denial of a challenge for cause, a defendant must demonstrate that he was forced over objection to keep an unacceptable juror." Eizember v. State, 2007 OK CR 29, ¶ 36, 164 P.3d 208, 220 (citing Browning v. State, 2006 OK CR 8, ¶ 8, 134 P.3d 816, 828.) "This requires a defendant to excuse the challenged juror with a peremptory challenge and make a record of which remaining jurors the defendant would have excused if he had not used that peremptory challenge to cure the trial court's alleged erroneous denial of the for cause challenge." Id. 
¶12 Here, Appellant did not request additional peremptory challenges, nor did he identify which allegedly unfit jurors he would have excused had he been granted more challenges. As a result, Appellant has waived this claim for appellate review and we review only for plain error. Browning, 2006 OK CR 8, ¶ 9, 134 P.3d at 828. Under the test set forth in Simpson v. State, 1994 OK CR 40, ¶¶ 10, 26, 30, 876 P.2d 690, 694, 699, 701, this Court determines whether the appellant has shown an actual error, which is plain or obvious, and which affects his or her substantial rights. This Court will only correct plain error if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. Id. Hogan v. State, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923. See also Jackson v. State, 2016 OK CR 5, ¶ 4, 371 P.3d 1120, 1121; Levering v. State, 2013 OK CR 19, ¶ 6, 315 P.3d 392, 395.
¶13 In Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851-52 (1985), the United States Supreme Court held that the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" See also Jones v. State, 2009 OK CR 1, ¶ 14, 201 P.3d 869, 877; Warner v. State, 2001 OK CR 11, ¶ 8, 29 P.3d, 569, 573. The Court added that this standard does not require a juror's bias be proved with "unmistakable clarity." Wainwright, 469 U.S. at 424, 105 S.Ct. at 852. The Supreme Court further addressed the issue in Morgan v. Illinois, 504 U.S. 719, 729, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992), wherein the Court held that, "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." Such prospective jurors are to be removed from the jury panel for cause. Id. The Morgan and Wainwright decisions require that jurors be willing to go into the trial with no preconceived notions regarding the appropriate penalty, death or life. The selection of jurors involves many subtle observations, and trial courts have broad discretion when considering a request to excuse a juror for cause. Underwood v. State, 2011 OK CR 12, ¶ 37, 252 P.3d 221, 240 citing Wainwright, 469 U.S. at 425, 105 S.Ct. at 853. See also Eizember v. Trammell, 803 F.3d 1129, 1135 (10th Cir.2015)("the trial judge is best positioned to determine whether a potential juror will be able to follow his or her instructions-and that a court of appeals removed from the live proceedings must afford significant deference to the trial judge's assessments").
¶14 Having thoroughly reviewed the responses of prospective jurors, M.S., J.L.W., T.S., S.S., D.M., and J.W., we find none of them expressed any preconceived notions of the appropriate punishment or views which would prevent or substantially impair the performance of his or her duties as a juror in accordance with the instructions and his or
her oath. Therefore, we find the trial court did not abuse its discretion in denying the challenge for cause. Finding no error, we find no plain error.
¶15 On appeal, Appellant acknowledges the failure to request additional peremptory challenges or identify jurors as required by this Court, but now names four additional jurors who sat on the jury, S.C., S.H., J.H., and N.M., and argues they were similarly unfit to serve. "Any claim of jury partiality must focus on the jurors who ultimately sat." Rojem v. State, 2006 OK CR 7, ¶ 36, 130 P.3d 287, 295 (citing Ross v. Oklahoma, 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80 (1988)). See also Eizember, 2007 OK CR 29, ¶ 70, 164 P.3d at 229. This is because the loss of peremptory challenges is "not of constitutional dimension." Ross, 487 U.S. at 88, 108 S.Ct. at 2278. Appellant must establish prejudice in order to warrant relief. Rojem, 2006 OK CR 7, ¶ 36, 130 P.3d at 295.
¶16 Juror S.C. was one of the initial 30 persons called to the jury box. Under questioning by the State, he said he could keep an open mind as to all punishments. Defense counsel questioned prospective jurors based upon a hypothetical situation of "a guilty murderer, intentional killing and no excuses and no justification for it." When asked for his "feelings about the death penalty" in that situation, Juror S.C. replied, "I feel primarily that the punishment should fit the crime" and "I would be willing to listen to any circumstances that might be pertinent to that". When asked if he was "leaning toward one of the three [punishment] options", S.C. said, "I think initially I would be predisposed to think for the death penalty because that's what was made (sic) it out to the victim."
¶17 Juror S.H. told the court he could consider all three possible punishments. When asked by the prosecutor if he had any "qualms with either three of those punishments", S.H. replied, "not really, no." When asked to explain his answer, he said "it would be difficult but, yes, I could do it." S.H. said he could give "meaningful consideration" to the death penalty if the State proved its aggravating circumstances. He said "it'd be tougher" to give meaningful consideration to life without parole" but he could do so and that he would want to "hear the whole story." He explained it would not be impossible for him to consider life without parole and life imprisonment.
¶18 In response to questioning by defense counsel regarding his "thoughts" about the death penalty, S.H. said he "would really hate to be the one that says, yes, you have to die, but it's my duty." He indicated he understood that even if the State proved an aggravating circumstance, the State must still prove the aggravating circumstances outweigh the mitigating evidence and that even in that situation, he was not required to impose the death penalty. When asked if he leaned in any particular way, S.H. said he would "have to hear all - hear everything first." Under defense counsel's hypothetical, he said he would "lean more toward the death penalty, but I would listen to what everyone had to say and consider all three." S.H. disagreed with defense counsel's statement that in all first degree murder cases, the death penalty would be the first option. S.H. said he would have to hear all the facts and could consider a sentence of life without the possibility of parole for intentional malice aforethought murder. S.H. admitted though that at that point, he had no direction "on what malice and all that other stuff is by law", but said that at that moment, he would probably "lean away from life with the possibility of parole."
¶19 Juror J.H. initially told the court that he could consider all three punishment options. In response to the State's questions, J.H. said "the severity of the crime should actually in my opinion fit the punishment", but he could consider all three punishments. In response to defense counsel's hypothetical, J.H. said he could consider all three punishments. He said he would not "lean toward any of the three options more than any other option", "depending on the severity of the murder." J.H. said he would want to know about the mitigating evidence and that it might make a difference to him.
¶20 Juror N.M. also initially told the court he could consider all three possible punishments. Under questioning by the State, he said that if death was determined to be the appropriate punishment, he would not have a problem signing that verdict. N.M. indicated he could consider a sentence of life without parole if that was warranted by the evidence. Under questioning by defense counsel, N.M. said he did not have "a problem with the death penalty", explaining that it depended on "if it fits the crime." He said he was "kind of" one of those people "who are an eye-for-an-eye kind of person" but he wanted to know all of the evidence. He said he would listen to all of the mitigating evidence, and that his mind was not "pre-formed or pre-made up . . . , to death or life without parole" until he had heard all of the evidence.
¶21 None of these four jurors was challenged for cause by Appellant. A review of the voir dire shows that each of these four jurors affirmed their ability to consider all three punishment options, to listen to all of the mitigating and aggravating evidence, and abide by their duty as a juror to impose the most appropriate punishment based on the evidence. None of these four jurors indicated they were irrevocably committed to a particular punishment before trial began. None of these four jurors expressed views on capital punishment which would prevent or substantially impair the performance of his or her duties as a juror in accordance with the instruction and his or her oath. The record shows that each was qualified to serve and could be a fair and impartial juror. Appellant has not shown he was forced to keep an unacceptable juror after he had exercised all of his peremptory challenges. Thus, he has not established prejudice sufficient to warrant relief. This proposition is denied.
¶22 In Proposition II, Appellant contends the trial court erred in denying defense counsel's request to voir dire potential jurors as to their ability to consider all three possible punishments in the event Appellant was convicted of murdering his mother. The record shows defense counsel repeatedly asked the court to be allowed to posit questions based upon the facts of the case to gauge the prospective jurors' views on punishment. Defense counsel particularly wanted to voir dire on the hypothetical situation of a defendant convicted of first degree murder where the victim was the defendant's mother. The trial court would not allow defense counsel to present that hypothetical to the jury but did allow questioning regarding the prospective juror's attitudes on the death penalty in the hypothetical situation of first degree intentional murder.
¶23 The purpose of voir dire examination is to ascertain whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges. Warner v. State, 2006 OK CR 40, ¶ 15, 144 P.3d 838, 858. The manner and extent of voir dire is within the discretion of the trial court whose rulings will not be disturbed on appeal absent a clear abuse of discretion. Eizember, 2007 OK CR 29, ¶ 67, 164 P.3d at 228. To facilitate jury selection, the trial court may restrict questions that are repetitive, irrelevant or in regard to legal issues upon which the trial court will instruct the jury. Hogan v. State, 2006 OK CR 27, ¶ 13, 139 P.3d 907, 917. No abuse of discretion will be found so long as the voir dire is conducted in a manner which affords the defendant a jury free of outside influence, bias or personal interest. Eizember, 2007 OK CR 29, ¶ 67, 164 P.3d at 228.
¶24 This Court has previously rejected claims of abuse of discretion by the trial court in restricting defense counsel from asking questions dealing with the specific facts of the case on trial or hypothetical situations mirroring the facts of the case on trial. Black v. State, 2001 OK CR 5, ¶ 19; 21 P.3d 1047, 1058; Jackson v. State, 1998 OK CR 39, ¶ 12, 964 P.2d 875, 883. In both Black and Jackson, we found no abuse of discretion as defense counsel's questions were an effort to test jurors' willingness to accept the theory of defense rather than to test their impartiality.
¶25 In the present case, we likewise find no abuse of discretion. Defense counsel's hypothetical questions regarding the specific facts that the murder victim was the defendant's mother seemed designed to test the jury's willingness to accept the theory of defense rather than to test their impartiality. Further, counsel's questions were an attempt to prejudice the case and try the capital sentencing stage of the trial before it had begun. Appellant argues that questioning on the specific facts of the case was relevant as several potential jurors said that the status of the victim as a family member might make a difference in their ability to consider all three punishments. None of the three prospective jurors named by Appellant (in a footnote to this proposition) actually sat on the jury that rendered the verdict in this case.
¶26 This Court has held that it is "not interested in whether or not a certain question was allowed to be asked, but rather whether the defendant was allowed sufficient voir dire to determine if there were grounds to challenge a particular juror for cause and to intelligently exercise his preemptory challenges." Jackson, 1998 OK CR 39, ¶ 11, 964 P.2d at 883. Here, the trial court allowed considerable leeway in questioning regarding the potential jurors' views on punishment.
¶27 Appellant compares his case to Turner v. Murray, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), a capital case, where the trial judge refused the defendant's request to question prospective jurors on the issue of racial prejudice. The Supreme Court held that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. Id., 476 U.S. at 36-37, 106 S.Ct. at 1688. The Supreme Court explained that "[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected." Id., 476 U.S. at 35, 106 S.Ct. at 1687. Further finding that "the risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence", the Court said that by refusing to question prospective jurors on racial prejudice, "the trial judge failed to adequately protect the defendant's constitutional right to an impartial jury." Id., 476 U.S. at 35-36, 106 S.Ct. at 1688. Appellant's reliance on Turner is misplaced. Appellant's attempt to put the concerns regarding the risk of racial prejudice infecting a capital sentencing proceeding on the same footing as a potential juror's knowledge that the crime on trial involved matricide is not persuasive.
¶28 The limitations imposed upon the defense's voir dire in this case were proper. See Harmon v. State, 2011 OK CR 6, ¶ 9, 248 P.3d 918, 928. The record shows that defense counsel was permitted to question the potential jurors at length about their attitudes toward the death penalty. The district court's limitation on the use of a hypothetical question involving the specific facts of the case did not prevent defense counsel from fully exploring the potential jurors' views on the death penalty. The voir dire allowed was broad enough to enable defense counsel to challenge prospective jurors for cause and to intelligently exercise peremptory challenges. We find no abuse of the trial court's discretion and this proposition of error is denied.
¶29 In Proposition III, Appellant contends the trial court erred in accepting the State's explanation for removing prospective Juror R.G. with a peremptory challenge in the face of Appellant's objection under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). "The Equal Protection Clause forbids the prosecution from challenging potential jurors solely on account of their race." Mitchell v. State, 2011 OK CR 26, ¶ 41, 270 P.3d 160, 173 (quoting Batson v. Kentucky, 476 U.S. at 89, 106 S.Ct. at 1719). Further:
In order to raise an equal protection challenge to the State's use of peremptory challenges, the defendant must first make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Then, the burden shifts to the prosecutor to articulate a race-neutral explanation related to the case for striking the juror in question. The trial court must then determine whether the defendant has carried his burden of proving purposeful discrimination. The trial court's findings are entitled to great deference, and we review the record in the light most favorable to the trial court's ruling. 
Id. (internal citations omitted).
¶30 When the State sought to excuse R.G. with a peremptory challenge, Appellant objected and raised a Batson challenge. When asked to give a race-neutral explanation for the removal, the State gave five: 1) that R.G. caused a significant delay on the first day of voir dire by absenting himself from the courtroom and thus causing the court to adjourn early for the day; 2) when called to the jury box, R.G. responded, "shit"; 3) he had been previously prosecuted and convicted by the district attorney's office (the same office prosecuting Appellant), for embezzlement, receiving a two year deferred sentence; 4) his father had been previously prosecuted and convicted of armed robbery, the same crime which would be used for enhancement purposes in the second stage; and 5) his beliefs indicated he would not consider the death penalty as he considered it too light of a punishment. Appellant takes issues with each of the State's explanations, finding them merely a pretext to conceal racial discrimination.
¶31 The record reflects that late in the day, on the first day of jury selection, R.G. asked to be excused for the restroom. When he did not return after approximately 20 minutes, the court adjourned for the day. When asked about this the next day, the prospective juror indicated he did not return to the courtroom because he felt ill but he felt fine the next day. The court accepted his explanation and continued with voir dire. Defense counsel raised an objection and moved for a mistrial because the court's initial conversation with the prospective juror was in private. The court relayed to counsel the reason for the prospective juror's absence and denied the objection and motion for a mistrial. Both the State and the defense waived calling the prospective juror to repeat what he had told the judge. Neither the State nor the defense voiced any objection to continuing on with voir dire. Appellant asserts the State expressed no hesitation in proceeding with voir dire and that the issue was resolved to both party's satisfaction. The record indicates the State did not voice any opinion at that point as to R.G.'s presence in the venire.
¶32 Appellant compares R.G.'s situation to that of prospective juror P.B. who also caused delays in jury selection. The record shows that P.B. simply missed a part of jury selection by showing up late the second day. Noting that the prospective juror was not present for the start of proceedings that day, the court continued on with jury selection. No objections were raised by the State or the defense and there was no delay in the proceedings. Defense counsel eventually asked for P.B.'s excusal, with no objection by the State, due to her failure to follow the concepts and questions discussed in jury selection. This record shows P.B.'s situation was very different from that of R.G.'s. The State's decision not to seek P.B.'s excusal due to her being late on the second day does not support Appellant's argument that the first reason given for excusing R.G. was not race-neutral.
¶33 Appellant claims that the State questioned R.G. "in a light hearted manner" about his response when called to the jury box. Therefore, he claims that to use that later to excuse him was racially motivated. It is not clear from the record whether the exchange between the prosecutor and R.G. was in a light hearted manner. What is clear from the record is that R.G. said he did not want to be on the jury panel, explaining that he "wanted to stay in [his] little corner in the back of the courtroom." This Court has found that a prospective juror's desire not to sit on a jury a sufficient race-neutral rationale for excusal by peremptory challenge. Smith v. State, 2007 OK CR 16, ¶¶ 13-15, 157 P.3d 1155, 1162-63.
¶34 Appellant challenges the third and fourth reasons for removal - R.G.'s prior prosecution and conviction by the same district attorney's office involved in the trial and his father's prior conviction - by arguing that these reasons had a disparate impact upon minorities and by pointing out two prospective jurors whom the State did not seek to excuse who had either personal prior convictions or family members with prior convictions.
¶35 Past criminal history, either of a prospective juror or of a relative, has been found to be a race neutral reason for removal. Coddington v. State, 2006 OK CR 34, ¶ 14, 142 P.3d 437, 444; Harris v. State, 2004 OK CR 1, ¶ 22, 84 P.3d 731, 743; Black, 2001 OK CR 5, ¶ 32, 21 P.3d at 1061-1062; Short v. State, 1999 OK CR 15, ¶ 15, 980 P.2d 1081, 1092. While Appellant points to two jurors who had prior convictions or relatives with prior convictions, he fails to acknowledge two other prospective jurors, not identified as members of a minority, who were excused based upon either their own prior conviction or that of a boyfriend. These strikes show that the State was not acting with any racially motivated pretext when it sought R.G.'s removal for these two reasons.
¶36 Appellant cites to Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) to support his claim that striking potential jurors for criminal involvement has the potential to disparately impact black jurors or to conceal purposeful racial discrimination and this disparate impact alone could be sufficient to support a finding of purposeful, impermissible racial discrimination. Hernandez involved a prosecutor's removal of bilingual, Spanish speaking jurors in a case involving a Latino defendant. In finding a race-neutral basis had been given for the peremptory strikes, a plurality of the Supreme Court said:
In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law. A court addressing this issue must keep in mind the fundamental principle that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact....Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." "'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected ... a particular course of action at least in part 'because of,' not merely 'in spite of,' it's adverse effects upon an identifiable group." 
500 U.S. at 359-360, 111 S.Ct. at 1866 (internal citation omitted).
¶37 Appellant has failed to show any proof of racially discriminatory intent or purpose as a result of excusing prospective jurors based upon criminal history.
¶38 Finally, Appellant asserts that R.G. said he was capable of considering all three possible punishments and gave no answers indicating he could not sit on the jury. While R.G. did say he could consider all three punishments, he also told the prosecutor he felt like a person "should suffer for the rest of their life because death is the easy way out . . . you could always consider death if it's just overwhelming, but I'd rather have a person suffer and have to deal with it till they die than just put them out of their misery." R.G. reiterated this sentiment when questioned by defense counsel. When asked if he understood that life without the possibility of parole meant just that, R.G. responded, "they have to deal with what they did till they die, not just get out of it by dying." This Court has found no discriminatory intent in the striking of a juror who expressed reservations about his or her ability to impose the death penalty. Harris, 2004 OK CR 1, ¶ 20, 84 P.3d at 743.
¶39 A race-neutral reason given by the prosecutor need not rise to the level of justifying excusal for cause, but it must be a "clear and reasonably specific" explanation of his or her "legitimate reasons" for exercising the challenges. Coddington, 2006 OK CR 34, ¶ 11, 142 P.3d at 443. "[A] pretextual reason, that is, one not supported by the record, should be rejected." Bland v. State, 2000 OK CR 11, ¶ 16, 4 P.3d 702, 711. In this case, the prosecutor's reasons for excusing R.G. were supported by the record. A record which shows the prosecutor did not exercise peremptory challenges to purposefully discriminate and exclude jurors on the basis of race. The trial court did not abuse its discretion in accepting the prosecutor's reasons for excusing R.G. This proposition is denied.
FIRST STAGE ISSUES
¶40 In his fourth proposition of error, Appellant contends the trial court erred in admitting the decedent's statement identifying him as her attacker. Appellant concedes that no objection was raised at trial to the admission of the statement and therefore our review is for plain error. As previously stated, when we review for plain error, an appellant must show an actual error, which is plain or obvious, affecting his substantial rights. Hogan, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.
¶41 Relying on Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), Appellant asserts that the hearsay statements were testimonial in nature and their admission violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. The State responds that the decedent's statements met the hearsay exception of a dying declaration and therefore do not violate the Confrontation Clause.
¶42 In both state and federal criminal prosecutions, an accused has a right "to be confronted with the witnesses against him." Mitchell v. State, 2005 OK CR 15, ¶ 15, 120 P.3d 1196, 1202 (citing U.S. Const. amends. VI and XIV; Okla. Const. art. 2, § 20). In Michigan v. Bryant, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), the United States Supreme Court summed up the law on the right to confrontation as follows:
The Confrontation Clause of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The Fourteenth Amendment renders the Clause binding on the States. In Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), we explained that the confrontation right does not bar admission of statements of an unavailable witness if the statements "bea[r] adequate 'indicia of reliability.' " We held that reliability can be established if "the evidence falls within a firmly rooted hearsay exception," or if it does not fall within such an exception, then if it bears "particularized guarantees of trustworthiness." 
562 U.S. at 352-353, 131 S.Ct. at 1152 (internal citation omitted).
¶43 The Supreme Court overruled Ohio v. Roberts in Crawford v. Washington, 541 U.S. at 60-63, 124 S.Ct. at 1369-1371. In Crawford, the Supreme Court drew a distinction between "testimonial" and "nontestimonial" hearsay statements, noting that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." 541 U.S. at 51, 124 S.Ct. at 1364. Crawford limited the Confrontation Clause's reach to "testimonial" statements and held that in order for testimonial evidence to be admissible, the Sixth Amendment "demands what the common law required: unavailability and a prior opportunity for cross-examination." Bryant, 562 U.S. at 354, 131 S.Ct. at 1153 (quoting Crawford, at 68, 124 S.Ct. 1354). Under Crawford and its progeny, the test for determining whether the admission of an out-of-court statement offered for the truth of the matter asserted violates the Confrontation Clause focuses on whether the statement was testimonial or non-testimonial. "Only statements of this sort [testimonial] cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Davis, 517 U.S. at 821, 126 S.Ct. at 2273.
¶44 The State relies on Giles v California, 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) to argue that the Supreme Court has said that dying declarations "do not run afoul of the Confrontation Clause." In Giles, the Supreme Court considered whether a defendant forfeits his rights under the Confrontation Clause when a judge determines that a wrongful act by the defendant made the witness unavailable to testify at trial. However, the State did not dispute, and the Supreme Court "accept[ed] without deciding", that the out-of-court statements at issue were testimonial. Id., 554 U.S. at 358, 128 S.Ct. at 2682. Therefore, Giles tells us that the first determination to be made regarding the admissibility of the hearsay statement is whether it is testimonial or non-testimonial. Whether the statement is admissible under an exception to the hearsay rule is a separate issue.
¶45 In Crawford, the Supreme Court did not provide a comprehensive list of what it considered to be a "testimonial statement". This came a few years later in Davis v. Washington and Hammon v. Indiana (two cases consolidated for consideration). Davis and Hammon were both domestic violence cases. The Supreme Court expanded upon the meaning of "testimonial" in a situation involving an ongoing emergency. The Supreme Court explained:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Davis, 547 U.S. at 822, 126 S.Ct. at 2273-74.
¶46 "To determine whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." Bryant, 562 U.S. at 359, 131 S.Ct. at 1156, (quoting Davis, 547 U.S. at 822, 126 S.Ct. at 2273-2274). Whether an emergency exists and is ongoing is a highly context-dependent inquiry. Id., 562 U.S. at 363, 131 S.Ct. at 1158.
¶47 Here, police responded to Ms. Diggs' call to find the 85 year old victim, lying on the floor of her bedroom, face down on her left side. She was unable to get up on her own. Her face was bruised and extremely swollen on the left side. Ms. Diggs went to help her grandmother sit up and keep her from trying to stand up. A police officer asked Ms. Diggs to ask her grandmother whether she was in pain and "who did it?" Ms. Diggs testified at trial that the victim replied by making the sign she used to identify Appellant. Emergency medical personal arrived soon after and Adam Simmons, a responding paramedic, also asked Ms. Diggs to ask her grandmother what had happened. Mr. Simmons testified at trial that Ms. Diggs told him that her grandmother said "her son did it", that he had an object in his hand and there "was an unknown amount of hits." The victim was then transported to the hospital.
¶48 "A conversation which begins as an interrogation to determine the need for emergency assistance" can "evolve into testimonial statements." Bryant, 562 U.S. at 365, 131 S.Ct. at 1159. "This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute." Id. Appellant argues that after the initial questioning of the victim pertaining to her physical condition, the primary purpose of the questioning was to prove past events potentially relevant to later prosecution.
¶49 The initial inquiries in this case resulted in the type of nontestimonial statements upheld in Davis. At the time the victim identified Appellant as her attacker, police did not know if Appellant was still in the house, if he was armed, if he had left the house or if he was likely to return. Once named, Appellant was quickly identified as a convicted felon, one potentially armed. The situation soon encompassed not only a threat to the victim but also potentially to the police and the public. "When an officer arrives on the scene and does not know where the perpetrator is, whether he is armed, whether he might have other targets, and whether the violence might continue at the scene or elsewhere, interrogation that has the primary purpose of establishing those facts to assess the situation is designed to meet the ongoing emergency and is nontestimonial." Bryant, 562 U.S. at 371-372, 131 S.Ct. at 1163. The questions asked by the officer and paramedic in this case - what had happened and who had injured the victim - "were the exact type of questions necessary to allow the police to 'assess the situation, the threat to their own safety, and possible danger to the potential victim' and to the public, . . . including to allow them to ascertain 'whether they would be encountering a violent felon,' . . . In other words, they solicited the information necessary to enable them 'to meet an ongoing emergency.'" Bryant, 562 U.S. at 376, 131 S.Ct. at 1166 (quoting Davis, 547 U.S. at 827 & 832, 126 S.Ct. at 2276 & 2279). Based upon the facts in this case, we cannot say that a person in the victim's situation would have had a "primary purpose" "to establish or prove past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822, 126 S.Ct. at 2273.
¶50 Because the circumstances of the encounter as well as the statements and actions of the victim and the police/paramedic objectively indicate that the primary purpose of the interrogation was to enable medical assistance to the victim and police assistance to meet an ongoing emergency, the victim's identification of Appellant as her assailant was nontestimonial hearsay. Based upon the facts of this case, we find the Confrontation Clause did not bar the admission of her statement.
¶51 Relying on Miller v. State, 2004 OK CR 29, ¶ 27, 98 P.3d 738, 744 Appellant asserts that even if we find the hearsay statement nontestimonial, in order for it to be admissible, we must find that it falls within a firmly rooted hearsay exception and there is no firmly rooted exception that fits the statement in this case. Since we decided Miller, the Supreme Court decided Davis and Bryant and made it clear that deciding whether the admission of a hearsay statement violates the Confrontation Clause based upon whether it is testimonial or nontestimonial in nature is a separate analysis from determining whether the statement is admissible under an exception to the hearsay rule. Therefore, for purposes of the Confrontation Clause, we find the statements in this case were nontestimonial and their admission did not violate Appellant's rights under the Confrontation Clause. We find no error and thus no plain error.
¶52 Appellant's assertion that there are no hearsay exceptions which fit the statements in this case leads to Proposition V. There, Appellant argues that the improper admission of the decedent's hearsay statements violated his constitutional rights to due process under the Fifth and Fourteenth Amendments. Appellant asserts that the statements were inadmissible as they were unreliable hearsay and were not corroborated by any other evidence. Our review is again for plain error, as Appellant raised no objections to the admission of the decedent's statements. Hogan, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.
¶53 As no objections to the admission of the declarant's hearsay statements were raised at trial, there is no record of any discussion regarding the admissibility of the statements. In Proposition IV, the State argued that the decedent's hearsay statements were properly admitted under the dying declaration exception to the hearsay rule. A well recognized exception to the hearsay rule, a dying declaration is defined as a statement made by a declarant, in a prosecution for homicide, while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death. 12 O.S.2011, § 2804(B)(2). See also Moore v. State, 1988 OK CR 176, ¶ 32, 761 P.2d 866, 871.
¶54 Here, the 85 year old victim was found lying on the floor with severe injuries to her face. She was conscious but unable to move on her own accord. She was placed in a "C" collar and immobilized on a back board before being moved onto a stretcher and then to the ambulance. She was able to interact with emergency personnel and insisted on being taken to a hospital different from that suggested by the paramedics. While it is impossible to know exactly what the elderly victim was thinking at the time, we are not convinced that at the time she made her statements to emergency personnel, she believed her death was imminent. Her hearsay statements were not admissible under the dying declaration exception to the hearsay rule.
¶55 Another exception to the hearsay rule is that of an excited utterance. Title 12 O.S.2011, § 2803(2) provides that a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the startling event or condition" is not excluded by the hearsay rule. "An excited utterance must meet three foundational requirements: (1) a startling event or condition; (2) a statement relating to that startling event or condition; (3) made while the declarant is under the stress of excitement caused by the startling event or condition." Martinez v. State, 2016 OK CR 3, ¶ 50, 371 P.3d 1100, 1113; Mitchell, 2005 OK CR 15, ¶ 27, 120 P.3d at 1205. "We examine both the timing of the statement and its spontaneity on a case-by-case basis." Martinez, 2016 OK CR 3, ¶ 51, 371 P.3d at 1113. "Whether a statement qualifies as an excited utterance depends not on a fixed time but on the facts and circumstances." Id. "An excited utterance 'need not be substantially contemporaneous with the startling event or condition . . . so long as the declarant is under the stress of excitement at the time the statement is made.'" Id. 
¶56 Here, the elderly victim had been assaulted within moments of being found by the police. She had received a blow which made it impossible for her to move on her own and see clearly. Her responses to the officer and paramedic were her first communications since being assaulted. Considering the timing and circumstances of the decedent's statements, made while she was still under the evident stress of the startling and certainly unexpected assault, we find her statements could have been properly admitted as excited utterances.
¶57 A hearsay exception also exists for statements made for the purposes of receiving medical attention. 12 O.S.2011, § 2803(4). See also Kennedy v. State, 1992 OK CR 67, ¶ 10, 839 P.2d 667, 670. As the decedent's statements were made to emergency medical personnel soon after her assault in response to inquiries regarding her injuries, the statements were properly admitted under this exception. As the decedent's statements fell within more than one recognized hearsay exception, we find no error, and thus no plain error in their admission.
¶58 Appellant further argues that the State did not produce any witnesses to verify that Ms. Diggs was asked to question her grandmother about what happened and who assaulted her. Appellant also challenges Paramedic Simmons' statement that the decedent indicated her son assaulted her. Appellant asserts that Simmons' report does not say that he received such information directly from the victim only that it was gathered at the scene and that some of the information included in his report was provided by using "whatever drop down box was closest in similarity to the information he claimed he provided." Appellant goes on to argue that both Sgt. Ulman, one of the first officers on the scene, and Simmons testified to how "chaotic and emotional things were when dealing with Ms. Diggs and [the victim] in the bedroom." Appellant claims these were all factors to consider in assessing the reliability of the information gathered at the scene.
¶59 To the extent that Appellant argues the decedent's statements were not corroborated, there is no requirement of corroboration for their admission. Any apparent contradictions between the decedent's statements and witnesses' testimony does not make the statements inadmissible. Contradictions in the testimony and inconsistency in witness testimony does not render the evidence inherently unreliable, but goes to the weight of the evidence. Ochoa v. State, 1998 OK CR 41, ¶ 32, 963 P.3d 583, 596. The issue of credibility and reliability of evidence is an issue for the jury. Malicoat v. State, 2000 OK CR 1, ¶¶ 17-18, 992 P.2d 383, 397. "It is the jury's job to weigh the evidence, resolve conflicting evidence, and reconcile conflicting testimony." Bell v. State, 2007 OK CR 43, ¶ 12, 172 P.3d 622, 626-627. Accordingly, we find no error and thus no plain error.
¶60 In Propositions VI and VII, Appellant challenges the testimony of four witnesses: Sgt. Ulman; Paramedic Simmons; Michael Hahn, M.D., the neurosurgeon on call at Mercy Hospital the night the decedent was taken in and who performed surgery on her; and Tobias Frederick, Appellant's brother. In Proposition VI, Appellant asserts he was denied his due process rights to a fundamentally fair trial by the State's failure to give notice that these witnesses would testify as experts in identifying the source of or excluding the source of the decedent's head injuries. In Proposition VII, Appellant challenges the actual testimony of Ulman, Simmons and Tobias Frederick arguing that it was beyond the witnesses' training and experience and was merely speculation. He claims the testimony was unreliable, prejudicial and denied him his due process rights to a fair trial.
¶61 The lack of notice claim raised in Proposition VI is being raised for the first time on appeal. No objections based on lack of notice were raised before the trial court. Therefore, we review the claim for plain error only. Hogan, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.
¶62 Under 22 O.S.2011, § 2002(A)(1)(a),(b) & (d), upon request of the defense, the State shall be required to disclose the names and addresses of witnesses which the State intends to call at trial, together with their relevant, written or recorded statement, if any, or if none, significant summaries of any oral statement; law enforcement reports made in connection with the particular case, and any reports or statements made by experts in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons. There is no requirement that the State is to designate in its witness list or summary of testimony that a witness will testify as an expert.
¶63 All of the challenged witnesses were included in the State's witness list. In the accompanying summary of expected testimony, it is stated that each of the above witnesses would testify to their observations of the victim at the crime scene. Regarding Dr. Hahn, the summary of testimony provided that he would testify consistent with his reports prepared in his treatment of the decedent. However, as Appellant points out, none of the witness summaries specifically stated that the witnesses would give their opinion as to the source of the decedent's head injuries.
¶64 The record indicates Appellant was not surprised by this opinion testimony. He did not claim surprise or ask for a continuance to rebut the testimony. Further, the record shows that except for Dr. Hahn, none of the challenged witnesses were offered or qualified as experts in head trauma or the source of the decedent's injuries. Finding no statutory requirement to designate witnesses as experts, and as the summary of testimony sufficiently informed the defense of the anticipated testimony of the witnesses, we find no error and thus no plain error. Proposition VI is denied.
¶65 In Proposition VII, Appellant admits that Sgt. Ulman and Tobias Frederick were not offered or qualified by the trial court as expert witnesses. During the direct examination of both witnesses, defense counsel objected on grounds that the State was trying to qualify the witnesses as experts in head trauma. The trial court overruled the objection and allowed the witnesses to testify as lay witnesses based upon their own observations and personal knowledge. See 12 O.S.2011, § 2701.
¶66 In light of Appellant's objection, we review the trial court's ruling for an abuse of discretion. An abuse of discretion is any unreasonable or arbitrary action taken without proper consideration of the facts and law pertaining to the matter at issue or a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented. State v. Delso, 2013 OK CR 5, ¶ 5, 298 P.3d 1192, 1194.
¶67 Appellant relies on Williams v. State, 2008 OK CR 19, 188 P.3d 208 and Head v. State, 2006 OK CR 44, 146 P.3d 1141 to argue that the opinion testimony of Ulman and Frederick was improperly admitted. In Williams, a police officer testified to injuries present on the defendant's body at the time of arrest - a fresh abrasion on his right wrist and hand area, and a laceration on his left shin. He explained that in meeting with other detectives, it had been determined that one of the suspects had fled by jumping off a second floor balcony and that the defendant's injuries "looked like injuries that one might receive by . . . jumping and falling." Williams, 2008 OK CR 19, ¶ 80, 188 P.3d at 225. This testimony was offered by the State as lay witness opinion testimony. Reviewing for plain error, this Court found it "impossible for a lay person to determine how the injuries occurred", and without some specialized knowledge, any opinion about the source of the injuries was pure speculation. Id., 2008 OK CR 19, ¶ 83, 188 P.3d at 225.
¶68 In Head, the officer testified that the robbery victim, when shown a photographic display, indicated through body language that he recognized the defendant as the man who robbed him. However, the victim had not made a pre-trial identification of the defendant and failed to identify the defendant at trial. 2006 OK CR 44, ¶ 17, 146 P.3d at 1146-47. Reviewing for plain error, this Court saw the officer's testimony as an attempt to take the victim's lack of explicit identification as a positive identification. This Court found that using the testimony of a police officer in the "guise of expert opinion" in this manner is error. Id., 2006 OK CR 44, ¶ 18, 146 P.3d at 147-48.
¶69 In Williams and Head, the officers testified to something that could only be known by someone with some sort of specialized knowledge - injuries received from jumping off a building and "the nonverbal medium of 'body language'". Head, 2006 OK CR 44, ¶ 18, 146 P.3d at 1146. In the present case, Sgt. Ulman and Officer Frederick gave their opinions on an issue any lay witness could give - whether the decedent's injury to the head looked consistent with that received from a fall to the ground from a standing position. The testimony in this case is similar to that found admissible in Mitchell where a lay witness testified that the injuries he saw on the victim looked like bite marks. 2011 OK CR 26, ¶ 76, 270 P.3d at 179. There, the trial court informed the jury that the witness was not qualified as an expert and did not know how the victim received her injuries. This Court found the testimony was based on the witness's personal observation and was properly admissible as lay witness opinion testimony. Id., 2011 OK CR ¶¶ 76-77, 270 P.3d at 179.
¶70 Appellant insinuates that merely because the witnesses were police officers that their testimony was that of an expert. However, neither witness was qualified as an expert. It is clear from their testimony that they were not present when the victim was injured and did not know how she was injured. Their testimony was based upon their own observations of the victim's head wound and physical surroundings of her bedroom. Their opinions as to the source of her injuries were relevant to rebut Appellant's claim that the decedent merely fell and hit her head. We find the testimony was properly admitted as lay witness opinion testimony under 12 O.S.2011, § 2701. See also Littlejohn v. State, 2004 OK CR 6, ¶¶ 34-35, 85 P.3d 287, 299. The trial court did not abuse its discretion in admitting the testimony.
¶71 As for Paramedic Simmons, no objection was raised to his testimony that he did not believe the decedent's injuries were consistent with a fall. Reviewing only for plain error, we find none. Jackson, 2016 OK CR 5, ¶ 4, 371 P.3d at 1121. Simmons testified that he arrived on the scene to find the victim lying on the floor but propped upright by Ms. Diggs. It was clear he was not present when she received her injuries. Simmons observed the injuries and prepared the victim for transport in the ambulance. His testimony concerning the source of her injuries was based upon his own personal observations and was therefore properly admitted as lay opinion testimony under 12 O.S.2011, § 2701. Proposition VII is denied.
FIRST STAGE JURY INSTRUCTIONS
¶72 In Proposition VIII, Appellant contends the trial court erred in refusing to give his requested instructions on the lesser included offenses of heat of passion manslaughter and second degree depraved mind murder as such instructions were warranted by the evidence. "The determination of which instructions shall be given to the jury is a matter within the discretion of the trial court." Eizember, 2007 OK CR 29, ¶ 111, 164 P.3d at 236. "Absent an abuse of that discretion, this Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law." Id.
¶73 When a defendant defends against a criminal charge by proclaiming innocence, he is not entitled to instructions on any lesser included offense. Harney v. State, 2011 OK CR 10, ¶ 11, 256 P.3d 1002, 1005; Grissom v. State, 2011 OK CR 3, ¶ 35, 253 P.3d 969, 982; Gilson v. State, 2000 OK CR 14, ¶ 119, 8 P.3d 883, 918. This rule applies whether the defendant presents his defense through his own testimony at trial as well as when the theory of defense is presented through statements of counsel. Grissom, 2011 OK CR 3, ¶ 35, 253 P.3d at 982. "Specifically, where the defendant makes admissions by counsel during trial that render every defense unavailable save one, he is deemed to have elected that defense; and may, by his election, foreclose the submission of instructions on other theories of defense or lesser-included offenses inconsistent with his defense." Id. From opening statement through cross-examination of witnesses to closing argument, Appellant asserted that he was not the source of the decedent's injuries; rather those injuries came as a result of her falling. Based upon this record, Appellant is not entitled to instructions on any lesser included offenses.
¶74 Appellant also asserts that by failing to instruct the jury on any lesser forms of homicide, his federal due process rights under Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) have been violated. In Beck, the Supreme Court held that a sentence of death may not constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict. 447 U.S. at 637, 100 S.Ct. at 2389. This holding was limited in Schad v. Arizona, 501 U.S. 624, 646, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), where the Court held that due process does not require the jury to be instructed on every non-capital lesser-included offense supported by the evidence, just that the jury may not be placed in an "all-or-nothing" choice between capital murder and innocence. Valdez v. Ward, 219 F.3d 1222, 1242 (10th Cir. 2000). See also Eizember v. Trammell, 803 F.3d 1129, 1147 (10th Cir. 2015). 
¶75 In contrast to Beck and Schad, a first degree murder conviction in Oklahoma is not automatically tied to the death penalty. The jury is not instructed that if they convict the defendant of the charged offense, they are required to impose the death penalty. Instead, Oklahoma juries have a choice. In the sentencing stage they must weigh mitigating evidence against aggravating circumstances before deciding to impose life in prison, life in prison without the possibility of parole or death. In Hooks v. Ward, 184 F.3d 1206 (10th Cir. 1999), the Tenth Circuit found that aspect of state law not sufficient to preclude a Beck analysis. Specifically, the Court said "a proper reading of Beck entitles a defendant in a capital case to a lesser included instruction when the evidence warrants it, notwithstanding the fact that the jury may retain discretion at sentencing to issue a penalty less than death." 184 F.3d at 1227. Therefore, Oklahoma's sentencing scheme does not preclude a Beck analysis.
¶76 However, the applicability of Beck in a case such as the present where a defendant defends himself by proclaiming innocence appears to be a question of first impression. As we have previously stated, an instruction on a lesser included offense is not warranted when a defendant chooses as his defense that of innocence, and not guilt of a lesser form of homicide. By choosing to proclaim his innocence, Appellant forecloses the admission of evidence or submission of instructions on other theories of defense. Grissom, 2011 OK CR 3, ¶ 35, 253 P.3d at 982. This Court was not called upon to do a Beck analysis in Grissom. As of the date of this opinion, the Tenth Circuit has not ruled on Grissom.
¶77 Beck repeatedly indicates that lesser-included-offense instructions are proper only where the evidence warrants them. Id. 447 U.S. at 635 n. 11, 636 & n. 12, 100 S.Ct. 2382, n. 11 & 12. This principle was upheld in Schad, 501 U.S. at 648, 111 S.Ct. at 2505. See also Valdez v. State, 1995 OK CR 18, ¶ 55, 900 P.2d 363, 378-379 ("Neither Beck v. Alabama nor Schad v. Arizona require that a jury in a capital case be given a third, non-capital option where the evidence absolutely does not support that option"). In a first degree murder prosecution like the present case, Beck requires a court to consider whether there was sufficient evidence introduced at trial from which a jury could rationally conclude that the defendant did not intend to kill the victim and that supported a finding of guilt of a lesser form of homicide. Taylor v. Workman, 554 F.3d 879, 890 (10th Cir. 2009). The sufficiency of the evidence of the greater offense is distinct from the Beck inquiry into whether the evidence might allow a jury to acquit a defendant of the greater of the offenses and convict of the lesser. Hogan v. Gibson, 197 F.3d 1297, 1305 (10th Cir.1999).
¶78 In the present case, since Appellant elected to defend himself on a claim of innocence and not guilt of a lesser offense, there is no evidence of a lesser offense to consider. Defense counsel did not present evidence nor argue that Appellant killed the victim but did so without malice. Counsel's cross-examination of witnesses and his argument in closing asserted that the victim's injuries were caused by her falling of her own accord. Counsel argued that Appellant did not intend to kill the victim, that the State did not have any evidence that he ever touched her after she left the kitchen, and that there was no evidence that he killed his mother.
¶79 In Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) the defendant admitted to not only killing the victim, but that he intended to kill the victim and that he would do the same thing again in similar circumstances. Id. 456 U.S. at 612, 102 S.Ct. at 2053. The Supreme Court found that "the evidence not only supported the claim that respondent intended to kill the victim, but affirmatively negated any claim that he did not intend to kill the victim." Id. 456 U.S. at 613, 102 S.Ct. at 254. Therefore, an instruction on a lesser form of homicide was not warranted. Id. 
¶80 Nothing in Beck suggests that the courts are constitutionally compelled to give lesser included offense instructions where they are not supported by the evidence. Under the facts of this case, we find Appellant's federal due process rights under Beck have not been violated because under state law he was not entitled to any instructions on lesser included offenses by claiming innocence as his defense and therefore there was no evidence upon which to find him guilty of a lesser form of homicide. Accordingly, this proposition of error is denied.
¶81 In Proposition IX, Appellant argues that improper argument concerning flight and the absence of a jury instruction on flight denied him his due process rights to a fair trial. The record shows that no instruction on flight was requested. During closing argument, the prosecutor referred to Appellant's leaving the decedent's home after she had been beaten and his absence once police arrived. No objections were raised to the absence of the flight instruction or the argument regarding flight. Now on appeal, Appellant asserts the argument regarding flight and/or failing to stop the proceedings and properly instruct the jury on how to consider flight evidence infringed upon his right to remain silent and was a violation of his rights to due process and a fair trial under the Fourteenth Amendment to the United States Constitution and Article II, § 7 and 20 of the Oklahoma Constitution. In the absence of any objections, our review is for plain error. Hogan, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.
¶82 Instructions on flight should be given only in cases where the evidence is controverted by the defendant and as an exception rather than as a rule. Mitchell v. State, 1993 OK CR 56, ¶ 11, 876 P.3d 682, 685.[2] See also Dawkins v. State, 2011 OK CR 1, ¶ 16, 252 P.3d 214, 219; Hancock v. State, 2007 OK CR 9, ¶ 104, 155 P.3d 796, 820; Jones v. State¸ 2006 OK CR 5, ¶ 43, 128 P.2d 521, 539. Before an instruction is given, the defendant must first present evidence explaining his departure. Mitchell, 1993 OK CR 56, ¶¶ 9-11, 876 P.3d at 684-685. Here, Appellant offered no evidence explaining his departure from the scene of the crime. Therefore, the giving of an instruction on flight was not warranted.
¶83 As for the prosecutor's closing arguments on flight, they were proper as based on the evidence and reasonable inferences therefrom. Sanchez v. State, 2009 OK CR 31, ¶ 71, 223 P.3d 980, 1004. Evidence of a defendant's actions after a crime is committed, including flight, is relevant to show consciousness of guilt. Dodd v. State, 2004 OK CR 31, ¶ 34, 100 P.3d 1017, 1031. Further, the prosecutor made no reference to Appellant's right to remain silent. Based upon the record before us, we find no error and thus no plain error in the absence of a flight instruction and the prosecutor's closing argument.
SUFFICIENCY OF THE EVIDENCE OF FIRST DEGREE MURDER
¶84 In Proposition X, Appellant challenges the sufficiency of the evidence supporting his first degree murder conviction. We review sufficiency of the evidence claims in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Davis, 2011 OK CR 29, ¶ 74, 268 P.3d at 111. This Court will accept all reasonable inferences and credibility choices that tend to support the verdict. Id. 
¶85 Appellant first argues that neither of the State's expert witnesses, Dr. Hahn and Dr. Harrison, "could conclusively exclude the possibility" that the decedent's injuries came from a fall. Drs. Hahn and Harrison both provided testimony and written reports which concluded that the decedent's injuries were not consistent with a fall from a standing position. Whether or not this testimony was conclusive on the subject was for the jury's determination. The credibility of witnesses and the weight and consideration to be given to their testimony are within the exclusive province of the jury. Id., 2011 OK CR 29, ¶ 83, 268 P.3d at 112. Here, the jury was well within its province in agreeing with the doctors' opinions.
¶86 Appellant also argues that the State "failed to overcome evidence that [he] was angry and upset and actually had a tussle with both Da'Jon Diggs and [the decedent] in the minutes leading up the arrival of the police," and that even if the Court finds the evidence sufficient to prove he caused the injuries, it does not prove beyond a reasonable doubt that the injuries were inflicted with the intent to take the decedent's life.
¶87 A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. 21 O.S.2011, § 701.7(A). "Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof." Id. "A design to effect death [i.e., premeditation] is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed." 21 O.S.2011, § 702. See also Davis, 2011 OK CR 29, ¶ 76, 268 P.3d at 111. Premeditation sufficient to constitute murder may be formed in an instant or it may be formed instantaneously as the killing is being committed. Id. Malice aforethought may be proved by circumstantial evidence. Id.
¶88 Unquestionably, the evidence showed that the decedent and Appellant quarreled and had a physical altercation shortly before her murder. Appellant shouted at his 85 year old mother and cursed her for taking some food. Appellant shoved his mother against the kitchen cabinet. Worried about the safety of her grandmother, Ms. Diggs intervened and led the decedent to her bedroom. A few minutes later, Appellant verbally attacked and threatened Ms. Diggs, ultimately chasing her out of the house. Still carrying the rock or brick he used to threaten Ms. Diggs, Appellant returned inside the house.
¶89 Although we cannot know for sure in which order subsequent events occurred, Appellant severely beat the decedent about the head, changed his clothes and then left the house. Appellant cites to a variety of extra-record evidence stating that physical pushing, shoving, and fighting was "a scenario not unique in that household."
¶90 Be that as it may, such a claim does not negate the inference that at the time of the murder, Appellant acted with malice aforethought. In fact, Appellant's evidence would seem to support the State's argument that Appellant had repeatedly argued with his mother and that he sought to put an end to those arguments by killing her. See Rutan v. State, 2009 OK CR 3, ¶ 55, 202 P.2d 839, 850 (defendant's history of threats and physical abuse inflicted on the victim supported the finding that the victim died as a result of the criminal acts of the defendant). He silenced his mother by beating her in the head to the extent that her face was almost unrecognizable. When apprehended the following day, Appellant's right hand was extremely swollen. The manner of killing and pattern of wounds can support a finding the defendant intended to kill his victim. See Hogan, 2006 OK CR 27, ¶ 22, 139 P.3d at 919.
¶91 Based on the State's evidence, the jury could logically infer that Appellant deliberately intended to take the elderly decedent's life by beating her in the head. Having reviewed the evidence in the light most favorable to the State, we find sufficient evidence was presented to prove beyond a reasonable doubt that Appellant acted with malice aforethought when he killed the decedent. This proposition of error is denied.
SECOND STAGE ISSUES
¶92 In Proposition XI, Appellant challenges the use of his prior conviction for First Degree Burglary to support the aggravating circumstances of prior violent felony and continuing threat. First, Appellant contends there was no threat or use of violence in his prior conviction and the trial court erred in admitting the evidence without first holding a hearing pursuant to Brewer v. State, 1982 OK CR 128, 650 P.2d 54. Appellant argues that had a proper hearing been held, the evidence would not have been admitted to the jury.
¶93 The aggravating circumstance of prior violent felony provides: "[t]he defendant was previously convicted of a felony involving the use or threat of violence to the person." 21 O.S.2011, § 701.12(1). In Brewer, this Court said, "[t]he State is required to go beyond simple proof that a defendant in a capital case had prior felony convictions to establish the aggravating circumstance." 1982 OK CR 128, ¶ 36, 650 P.2d at 62. "The State must additionally prove that the prior felonies involved the use or threat of violence to the person." Id. When the aggravator is alleged, an in-camera hearing should be held in order to determine whether the prior crime actually involved the threat or use of violence. Id., 1982 OK CR 128, ¶ 41, 650 P.2d at 63.
¶94 In the present case, the First Degree Burglary conviction was included in the State's More Definite and Certain Statement in Re Punishment. In a pre-trial motion hearing, defense counsel moved to strike his non-violent felony convictions, specifically the first degree burglary conviction, from the more definite and certain statement. The State responded by setting out the facts of the prior conviction and arguing it was a violent offense. The court overruled the defense objection. There is no indication in the record that an objection was raised to the absence of the in-camera hearing required by Brewer. Therefore, we review that claim for plain error. Hogan, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.
¶95 The State asserts that a Brewer hearing was not required in this case because the prior conviction was also used to support the continuing threat aggravating circumstance. The State's interpretation of Brewer is not exactly correct. In Brewer, this Court said that following the in-camera finding by the trial court that the prior felony did involve the threat or use of violence, the defendant is to be given the opportunity to personally stipulate that the prior conviction involved the use or threat of violence. In Cole v. State, 2007 OK CR 27, 164 P.3d 1089, we held that the defendant does not have the right to so stipulate if the prior conviction is also used to support the aggravating circumstance of continuing threat. "When the State alleges both of these aggravators, 'the jury is entitled to have before it all possible relevant information about the individual defendant whose fate it must determine.'" Id. 2007 OK CR 27, ¶¶ 49-50, 164 P.3d at 1100. The Court has not held that merely because the same prior conviction is used to support the two aggravators, that a Brewer hearing is not required.
¶96 In Coddington, 2011 OK CR 17, 254 P.3d 684, this Court found that the record did not reflect that the trial court had conducted a pre-trial Brewer hearing on the evidence offered to support the prior violent felony aggravating circumstance. However, this failure was not found to require relief as the details of the convictions alleged to support the allegation that the defendant had prior violent felonies were admissible in support of the State's claim that the defendant presented a continuing threat to society. Id., 2011 OK CR 17, ¶ 56, 254 P.3d at 708.
¶97 Here, the record likewise does not reflect a Brewer hearing was held. The error was plain and obvious. Did this error affect Appellant's substantial rights? The State's evidence showed that Appellant broke into an occupied home at approximately 3:30 a.m. by twisting the locked doorknob. Appellant stole personal property, cash, credit cards and personal identification. The responding officers testified that Appellant was not cooperative with the officers, that he struggled and resisted arrest. Appellant said he was 19 years old when he was actually 25, and was found to be in possession of channel lock pliers.
[3] 
¶98 However, the homeowner testified that he was not aware of the burglary at the time of its commission and that he was awakened by police officers shouting at him to come outside with his hands up. When he responded, the homeowner was told by the officers that a burglary suspect might be inside the home. Appellant was located in the homeowner's backyard and taken into custody. This evidence shows that the crime did not involve the use of violence or the threat of violence to the homeowner or his family. Therefore, the evidence should not have been admitted to support the prior violent felony aggravator.

¶99 Details of the burglary were admissible for a different and entirely legitimate purpose, to support the continuing threat aggravator. See Smith v. State, 2013 OK CR 14, ¶ 62, 306 P.3d 557, 577. To support the continuing threat aggravator, "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." Smith v. State, 1991 OK CR 100, ¶ 29, 819 P.2d 270, 277 (quoting Jurek v. Texas, 428 U.S. 262, 275-276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976)). "This relevant information may include evidence from the crime itself, evidence of other crimes, admissions by the defendant of unadjudicated offenses, or any other relevant evidence." Id. Factual details of Appellant's prior burglary conviction meet this criteria.
¶100 Appellant argues that a First Degree Burglary conviction does not normally indicate a continuing threat of violence, citing to Lockett v. State, 2002 OK CR 30, 53 P.3d 418. In Lockett, this Court stated that "[w]hile a prior burglary conviction would not usually indicate the existence of a probability that the defendant would commit future criminal acts of violence constituting a continuing threat to society, it did so in the present case." 2002 OK CR 30, ¶ 33, 53 P.3d at 428. While Appellant did not have the five shotguns, two rifles, two pistols, three hunting knives and several boxes of ammunition that Lockett had, this Court has found that "[a] first degree burglary always carries with it the likelihood for a violent encounter with an occupant, and it is this likelihood which the jury must determine when it considers future dangerousness." Cleary v. State, 1997 OK CR 35, ¶ 74, 942 P.2d 736, 752. Appellant's forced entry into an occupied home during the early morning hours certainly carried with it the likelihood for a violent encounter and was sufficient to show that Appellant would commit future criminal acts of violence constituting a continuing threat to society.
¶101 Accordingly, we find the trial court's error in failing to hold the requisite Brewer hearing did not affect Appellant's substantial rights as evidence of the First Degree Burglary conviction, while not admissible to prove the prior violent felony aggravator, was admissible to support the continuing threat aggravator. Finding no plain error, this proposition is denied.
¶102 In Proposition XII, Appellant argues that admission of his juvenile offense, a First Degree Robbery conviction when he was 16 years old, to support the aggravating circumstances of prior violent felony and continuing threat violated his rights under the Eighth Amendment. This objection is raised for the first time on appeal. Therefore, we review only for plain error. Hogan, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.
¶103 Appellant relies on Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) where the Supreme Court held that execution of individuals who were under the age of 18 at the time of their capital crimes violates the Eighth and Fourteenth Amendments. Appellant argues that the holding and reasoning in Simmons should preclude the use of juvenile adjudications to support aggravating circumstances in a capital sentencing proceeding. This Court has previously rejected this claim. Harmon, 2011 OK CR 6, ¶ 74, 248 P.3d at 942; Coddington, 2011 OK CR 17, ¶¶ 51-52, 254 P.3d at 707; Mitchell v. State, 2010 OK CR 14, ¶¶ 83-87, 235 P.3d 640, 659-60. Appellant's analysis and authorities provide no reason to overturn our prior holding.
¶104 In Proposition XIII, Appellant challenges the sufficiency of the evidence supporting the prior violent felony aggravating circumstance. Referring to arguments raised in prior propositions of error, he reiterates that the evidence surrounding the First Degree Burglary conviction was insufficient to meet the statutory definition of prior violent felony and that evidence of his juvenile offense was improperly admitted under Roper v. Simmons. He argues that without this evidence, there is no support for the aggravator.
¶105 When the sufficiency of the evidence supporting an aggravator is challenged on appeal, we review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the facts necessary to support the aggravating circumstance beyond a reasonable doubt. Bush v. State, 2012 OK CR 9, ¶ 31, 280 P.3d 337, 345. 
¶106 As addressed in Proposition XI, Appellant's First Degree Burglary conviction did not contain evidence of the use of violence or the threat of violence to a person and was therefore not sufficient to support the prior violent felony aggravator.
¶107 Regarding the conviction for Robbery with Firearms, Appellant was shown to have walked into a gas station, carrying a white paper sack and a shotgun. Appellant pointed the shotgun at the store owner and ordered her to fill the sack with money. The owner complied and Appellant ran out of the store. When reviewed in the light most favorable to the State, we find this evidence sufficient to support the jury's finding of the prior violent felony aggravator beyond a reasonable doubt. See Patton. v. State, 1998 OK CR 66, ¶ 85, 973 P.2d 270, 295-296. This proposition is denied.
¶108 In Proposition XIV, Appellant claims that the evidence was insufficient to prove beyond a reasonable doubt that the decedent's murder was especially heinous, atrocious, or cruel. We review the record to determine whether the evidence, considered in the light most favorable to the State, was sufficient for a rational trier of fact to find the aggravating circumstance beyond a reasonable doubt. Postelle v State, 2011 OK CR 30, ¶ 78, 267 P.3d 114, 143. A particular murder is especially heinous, atrocious or cruel where the evidence shows: (1) that the murder was preceded by either torture of the victim or serious physical abuse; and (2) that the facts and circumstances of the case establish that the murder was heinous, atrocious or cruel. Id., at ¶ 79, 267 P.3d at 143. The "term 'torture' means the infliction of either great physical anguish or extreme mental cruelty." Id. A finding of "serious physical abuse" or "great physical anguish" requires that the victim have experienced conscious physical suffering prior to death. Id. "[T]he term 'heinous' means extremely wicked or shockingly evil; the term 'atrocious' means outrageously wicked and vile; and the term 'cruel' means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others." Id. 
¶109 Appellant and the decedent were arguing over food when the altercation began. He took food out of her hand and shoved her into the kitchen cabinet. This resulted in her being taken to her bedroom for her own safety. Appellant attacked the decedent in her bedroom, bludgeoning her in the head with either a rock, a brick or his hand. He either caused her to fall to the floor or struck her once she was on the ground. It is a reasonable inference from the evidence that the decedent saw Appellant, her own son, strike her. Due to her speech disabilities, she would have been unable to cry for help. Her injuries were so severe she was almost unrecognizable to her son Tobias. The bruising about her left eye was so bad that doctors were unable to open it later at the hospital. There is no dispute that the decedent was conscious throughout the attack. In fact she tried to get herself up from the floor but was unable to physically do so. Her head injuries were so severe that her skull was actually crushed in several places. Doctors ordered surgery within minutes of examining her. Evidence that the victim was conscious and aware of the attack supports a finding of torture and serious physical abuse. Pavatt v. State, 2007 OK CR 19, ¶ 75, 159 P.3d 272, 294; Patton, 1998 OK CR 66, ¶ 91, 973 P.2d at 296-97.
¶110 Appellant relies on Hawkins v. State, 1994 OK CR 83, 891 P.2d 586 to argue that the aggravator is not met due to the lack of gratuitous violence. In Hawkins, the victim's cause of death was drowning. This Court said that "[n]o evidence of serious physical abuse, that is, gratuitous violence inflicted on the victim beyond the act of killing" was present in the case. Id., at ¶ 33, 891 P.2d at 596-97. In Browning, 2006 OK CR 8, ¶ 50, 134 P.3d at 843, however, this Court noted that no definition of "serious physical abuse" has been adopted, "including the one in Hawkins . . . ." See also Bush, 2012 OK CR 9, ¶ 37, 280 P.3d at 337, 346. Further, in Hawkins, evidence of serious physical abuse was only one aspect of the aggravating circumstance examined by the Court. The Court went to look at evidence of torture and the infliction of extreme mental cruelty. This Court found the evidence sufficient to support the "most extreme form of mental cruelty" and ultimately the aggravating circumstance. Hawkins, 1994 OK CR 83, ¶ 45, 891 P.2d at 597. 
¶111 The evidence shows that Appellant intended to inflict a high degree of pain and did so with utter indifference to the decedent's conscious physical suffering. There was sufficient evidence for the jury to find beyond a reasonable doubt that the decedent's murder was especially heinous, atrocious or cruel. This proposition is denied.
¶112 In Proposition XV, Appellant asserts that the use of a previous acquittal to support the continuing threat aggravating circumstance renders his death sentence invalid under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and corollary provisions in the Oklahoma Constitution.
¶113 In support of the continuing threat aggravator, the State offered evidence that Appellant had been charged in the District Court of Oklahoma County, Case No. CF-2003-3810, with five counts of Kidnapping, five counts of Assault with a Dangerous Weapon, two counts of Assault and Battery with a Dangerous Weapon, one count of Using a Vehicle to Facilitate the Intentional Discharge of a Firearm and one count of Possession of a Firearm, After Former Conviction of a Felony. A jury acquitted Appellant on 13 counts and one count was dismissed by the State. Appellant objected to the use of this evidence. At a pre-trial hearing, the trial court overruled Appellant's objection finding that evidence of a prior acquittal could be properly admitted in support of the continuing threat aggravator. Appellant renewed his objection at the time the evidence was presented and was again overruled. We review the trial court's ruling admitting the evidence for an abuse of discretion. Davis, 2011 OK CR 29, ¶ 156, 268 P.3d at 125.
¶114 Appellant acknowledges our holding in Harmon, 2011 OK CR 6, ¶¶ 61- 63, 248 P.3d at 939-940 where we said that the Supreme Court and other courts have held that "the admission of acquitted conduct in sentencing proceedings is permissible provided the conduct is proven by a preponderance of the evidence" (citing United States v. Watts, 519 U.S. 148, 157, 117 S.Ct. 633, 638, 136 L.Ed.2d 554 (1997)).
¶115 Appellant challenges our reliance on Watts arguing that is an extremely narrow decision which may not still be good law. Watts was also challenged in Harmon, although on grounds that it had been rendered obsolete by Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) because Watts did not require evidence supporting the aggravating circumstance to be proven beyond a reasonable doubt in a capital sentencing proceeding. We found both cases distinguishable as neither required the offenses offered to prove future dangerousness be proven beyond a reasonable doubt. The cases only required that the aggravating circumstance to support a death verdict be proven beyond a reasonable doubt. Harmon, 2011 OK CR 6, ¶ 63, 248 P.3d at 940.
¶116 In the present case, Appellant cites no authority supporting his assertion that Watts is no longer good law. Instead, he relies on the fact that Watts was a short, per curiam opinion to which Justice Stevens wrote a strong dissent. Be that as it may, we have not found where Watts has been overruled and Appellant's attempts to distinguish the case are not persuasive.
¶117 In Harmon, quoting to Sanchez, 2009 OK CR 31, ¶¶ 69-70, 223 P.3d at 1004, this Court reiterated that we have long recognized that "unadjudicated offenses linked to a defendant in a capital case may be introduced to support the claim of future dangerousness." Further, "[a] defendant's conviction or acquittal of a criminal charge neither alters the basic evidentiary facts of the underlying conduct, nor determines whether those facts may be offered to show his future dangerousness in a capital sentencing trial." Id., 2011 OK CR 6, ¶ 62, 248 P.3d at 939-940. Evidence of a capital defendant's violent acts is relevant and admissible to show the existence of a probability the defendant poses a continuing threat, "whether those acts resulted in a conviction of the actual offense, some related or lesser included offense, or no conviction at all." Id.
¶118 Appellant briefly asserts that his jury was not instructed that any burden of proof was required or provided any definition of what that burden is. To the contrary, the jury was instructed that the State was required to prove beyond a reasonable doubt that the defendant's behavior demonstrated a threat to society and a probability that this threat will continue to exist in the future. Oklahoma Uniform Jury Instruction - Criminal 2d 4-74. The "beyond a reasonable doubt" standard is a higher standard of proof than the preponderance of the evidence standard discussed in Watts. 
¶119 Appellant argues that permitting the State to use his acquitted conduct forced him to defend himself from something he had already defeated. Appellant fails to recognize that it is his prior conduct that is being relied upon to prove the aggravator not that the conduct resulted in criminal charges. In the present case, the State presented two witnesses who testified that on June 27, 2003, Appellant entered a hair salon where at least five people were present. He pulled a gun from his waistband, pointed it at one of the hairdressers and pulled the trigger. The gun did not fire, so he struck the hairdresser in the head several times causing her to fall to the ground.
¶120 Appellant then pointed the gun at two more people and again pulled the trigger but the gun did not fire. He then pointed it at a woman who pleaded with him not to shoot because she was pregnant. Ignoring her pleas, he pointed the gun at her stomach and pulled the trigger. The gun did not fire. He hit the woman in the head causing her to fall to the floor. Appellant eventually exited the salon followed soon thereafter by the customers. Appellant jumped into a nearby car and fired at the salon customers as they left the building. The jury heard that this conduct resulted in the filing of criminal charges, a trial, and that Appellant was found not guilty by the jury.
¶121 "The focus of capital sentencing centers on the individual defendant's record and character." Id. 2011 OK CR 6, ¶ 63, 248 P.3d at 940. Appellant's conduct in the hair salon was properly admitted as relevant to the jury's consideration of his future dangerousness and whether he posed a continuing threat to society. This proposition is denied.
¶122 In Proposition XVI, Appellant asserts that use of his prior convictions for Robbery with Firearms and First Degree Burglary to support both the aggravating circumstances of prior violent felony and continuing threat is unconstitutional. This argument is being raised for the first time on appeal. Therefore we review only for plain error. Hogan, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.
¶123 This Court has rejected this specific claim numerous times, finding that evidence of prior convictions to support these two aggravating circumstances does not show the same aspect of Appellant or his crime. Coddington, 2011 OK CR 17, ¶ 57, 254 P.3d at 708; Rojem v. State, 2006 OK CR 7, ¶ 65, 130 P.3d 287, 300; Fitzgerald v. State, 2002 OK CR 31, ¶ 16, 61 P.3d 901, 906; Williams v. State, 2001 OK CR 9¶ 98-101, 22 P.3d 702, 725-26.
¶124 Appellant argues that under United States v. McCullah, 78 F.3d 1087, 1112 (10th Cir. 1996), the use of duplicative aggravating factors was found to create an unconstitutional skewing of the weighing process which necessitates a reweighing of the aggravating and mitigating factors. In Turrentine v. State, 1998 OK CR 33, ¶ 84, 965 P.2d 955, 978-979, we said that in McCullah, "the Court, . . . held that submission of four particular aggravating circumstances to the jury, one of which was a non-statutory aggravator, was unconstitutional as all four of the aggravators addressed the same aspect of the defendant's mental state." Id. We found McCullah distinguishable in that it highlights the difference in federal case law where both statutory and non-statutory aggravators are utilized. Id. We found this very different from our state statutory scheme where distinct aggravators aimed at very different aspects of the defendant's character and conduct are set forth and these are the only aggravators which can be utilized in determining the appropriateness of a death sentence. Id. This analysis has been upheld in Johnson v. Gibson, 169 F.3d 1239, 1252 (10th Cir. 1999).
¶125 As discussed in Proposition XI, the prior conviction for First Degree Burglary was insufficient to support the prior violent felony aggravator. Evidence of Appellant's prior conviction for Robbery with Firearms is indicative of Appellant's violent criminal past and sufficient to support the aggravating circumstance of prior violent felony. The underlying facts of the offense support the continuing threat aggravator by showing Appellant's propensity for violence and future dangerousness and the need to protect society from his probable future conduct. As the evidence in the present case supporting the two statutory aggravators involved different aspects of Appellant's character or crime, we find no duplication or overlapping of aggravators. Finding no error, we find no plain error and this proposition is denied.
¶126 In his seventeenth proposition of error, Appellant contends that the erroneous admission of evidence to support the aggravating circumstances violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Oklahoma Constitution. According to Appellant, the improperly admitted evidence consisted of evidence surrounding his prior convictions for First Degree Burglary and Robbery with Firearms and evidence of the 2003 criminal charges for which he was tried and acquitted. Appellant asserts that had this improperly admitted evidence been excluded from sentencing, the remaining evidence in aggravation would have been four instances of domestic violence, "dramatically altering the weighing process of aggravating circumstances and mitigating circumstances."
¶127 In Proposition XI, we found evidence of the First Degree Burglary insufficient to meet the statutory definition of prior violent felony, but sufficient to support the continuing threat aggravator. In Proposition XII, we found evidence of the prior conviction for Robbery with Firearms committed when Appellant was a juvenile properly admitted. In Proposition XV, we found evidence of Appellant's 2003 acquittal properly admitted. Based upon our analysis in those propositions of error, the improper admission of the First Degree Burglary conviction did not constitute plain error as the evidence was properly admitted to support the continuing threat aggravator. No other improper evidence was admitted during the capital sentencing stage of trial. Appellant's cumulative error claim with respect to this evidence is denied.
¶128 In Proposition XVIII, Appellant asserts that erroneous and highly prejudicial evidence was admitted during the sentencing stage which violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Oklahoma Constitution. Specifically, he refers to hearsay testimony from Natalie Patterson given during presentation of the evidence surrounding Appellant's 2003 charges and testimony from Inspector Klika regarding obtaining a buccal swab from Appellant. No objections were raised at trial to either testimony, therefore we review only for plain error. Hogan, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.
¶129 The State called Tammie Brookins to testify to events surrounding the 2003 incident at the hair salon. Ms. Brookins told the jury that Natalie Patterson was in the salon at the time and was six months pregnant. Brookins described how when Appellant pulled out his gun, Patterson ran to get away. Brookins testified that at some point, Appellant approached Patterson and "she was telling him, like please, don't - you know, don't shoot me, don't shoot me. He was, like, 'bitch, don't beg for your life now. You wasn't begging for your life when you was talking all that shit." Antonio Jackson, another patron at the salon, testified that Patterson was pleading with Appellant to leave her alone, that she said something about "her having a baby because she's pregnant" and Appellant basically told her "F your baby" and he pulled the trigger at her stomach. Ms. Patterson did not testify at trial.
¶130 Initially, we consider the alleged hearsay properly admitted in the absence of any objection. See Short v. State, 1999 OK CR 15, ¶ 32, 980 P.2d 1081, 1096 (when alleged hearsay is admitted without objection, the statements may be considered as though they are admissible). See also Plantz v. State, 1994 OK CR 33, ¶ 37, 876 P.2d 268, 279. Further, it is not clear that the statements were hearsay. The hearsay rule is applicable only when an out of court statement is offered to prove the truth of the matter asserted. 12 O.S.2011, § 2801(3). The hearsay rule, however, does not operate, to render inadmissible every statement repeated by a witness as made by another person. Woodruff v. State, 1993 OK CR 7, ¶ 57, 846 P.2d 1124, 1139. It does not exclude evidence offered to prove the fact that a statement was made or a conversation was had, rather than the truth of what was said. Id. 
¶131 Here, Patterson's statements were not offered to prove that she asked Appellant not to shoot her. The statements were offered to show Appellant's violent conduct during the 2003 incident at the hair salon which supported the State's theory that Appellant posed a continuing threat to society. We find no error and no plain error in the admission of Ms. Patterson's statements.
¶132 Inspector Klika testified that in June 2012, he executed a search warrant on Appellant at the county jail to obtain a buccal swab. Klika testified that Appellant resisted his attempts to obtain the swab. Appellant became aggressive and additional officers were called in to subdue Appellant. Klika said when he was finally able to get Appellant's mouth open to insert the swab, Appellant bit Klika's finger. This evidence was offered by the State to support the continuing threat aggravating circumstance.
¶133 Appellant contends that the "use of the covert warrant process" contravenes the law as set forth in Cole v. Parr, 1979 OK CR 51, 595 P.2d 1349. In Cole, the State petitioned the District Court to compel the defendant to allow the State to obtain blood, saliva, hair and seminal fluid samples from him. The State argued in its motion that certain items of evidence, i.e., hair, blood, and stains of an unknown nature, had been taken from the victim and the crime scene and that they were being held and examined. This Court framed the issue as "whether an examination and analysis of the defendant's specimens would be of probative value in the prosecution of this defendant." Id. 1979 OK CR 51, ¶ 2, 595 P.2d at 1351. This Court found that at the hearing in District Court, the State had "failed to demonstrate that the samples taken from the scene of the crime and the body of the victim were viable testing samples . . . or that any rational connection joined the samples within the possession of the State and the specimens sought of the defendant". Id.
¶134 Citing to Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), this Court said "the 'overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State.' This mandates a protection against those intrusions not justified in the circumstances nor made in a proper manner." This Court concluded:
Despite the State's assertion of necessity, we hold that it is not only unnecessary, but it is improper procedure to require an accused to provide physical samples for testing by the State prior to the State's testing of specimens from the body of the victim and the scene of the crime. . . . However, we see the issue as being whether the State has presented sufficient evidence of the probative value of such tests in the prosecution of the case. If the State can show the probative value of the requested tests at an evidentiary hearing, then the defendant may be subject to submitting to the extractions in a reasonable manner, of similar samples from his own body. 
Cole
, 1979 OK CR 51, ¶ 5, 595 P.2d at 1351-52.
¶135 The State asserts the prosecution did present sufficient evidence of the probative value of such tests prior to obtaining Appellant's buccal swab. The State argues this case is similar to Pyle v. State, 1982 OK CR 51, 645 P.2d 1390. In Pyle, the prosecution obtained a search warrant to retrieve hair, blood and saliva samples from the defendant. This Court said the affidavit articulated sufficient underlying facts to establish probable cause to believe that the defendant had committed the crime and that it provided the magistrate with probable cause to believe that the evidence requested to be seized would be probative in the prosecution of the case. Id., 1982 OK CR 51, ¶ 6, 645 P.2d at 1391. This Court found the search of the defendant's body pursuant to the valid search warrant was reasonable and that the State did not violate the appellant's Fourth Amendment right to be free from unreasonable search and seizures under Schmerber. The Court concluded that "the rule in Cole was sufficiently followed." Id. 
¶136 In the present case, the affidavit supporting the search warrant provided the magistrate with probable cause to believe the buccal swab from Appellant would be probative in the prosecution of Appellant for the decedent's murder. As in Pyle, we find the State's obtaining the buccal swabs from Appellant pursuant to the valid search warrant was reasonable, that Appellant's Fourth Amendment rights to be free from unreasonable search and seizures was not violated, and the principle of Cole was sufficiently followed. Id. 
¶137 Appellant also argues that his Sixth Amendment rights were violated when the prosecution did not notify defense counsel they were seeking a search warrant to obtain the buccal swab. Appellant not only raises this objection for the first time on appeal, but he fails to cite any authority in support of his claim. We note only that the law does not require notice be given before a search warrant is executed. The record reflects that the search warrant was obtained, executed and returned in compliance with state law. See 22 O.S.2011, §§ 1221-1238. Finding no error in Inspector's Klika's testimony, we find no plain error. This proposition of error is denied. 
ALLEGATIONS OF PROSECUTORIAL MISCONDUCT
¶138 In Proposition XIX, Appellant alleges that several instances of prosecutorial misconduct denied him a fair trial. It is well established that a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial. Davis, 2011 OK CR 29,¶ 174, 268 P.3d at 128. In order for the remarks of the prosecuting attorney to constitute reversible error they must be flagrant and of such a nature as to be prejudicial to the defendant. Id. From a practical standpoint, every slight excess by the prosecutor does not require that a verdict be overturned and that a new trial be ordered. Id.
¶139 None of the comments challenged on appeal were met with contemporaneous objections at trial. Therefore, our review is for plain error under the standard set forth above. Hogan, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.
¶140 During voir dire, the prosecutor asked a potential juror whether she recalled an earlier question about being able to consider all three possible punishments. The prosecutor added, "[a]nd when I say consider, deliberate and talk to 11 other jurors." Now on appeal, Appellant asserts the prosecutor improperly defined the word "consider" and this error "obviously affected" the way a potential juror answered the critical question whether he could consider a "straight life punishment". Appellant contends that in Mitchell v. State, 2010 OK CR 14, ¶ 32, 235 P.3d 640, 650, this Court cautioned courts against attempts to define or further explain the term "consider". In Mitchell, the appellant challenged death qualification questions asked by the trial court; specifically use of the term "meaningful consideration" which was not included in the uniform jury instructions. In a footnote to Mitchell v. State, 2006 OK CR 20, ¶ 40, n. 97, 136 P.3d 671, 690, n. 97 we cautioned courts against attempts to define or further explain the term "consider" because the word "consider" has a commonly understood meaning; and even good-faith attempts to clarify its significance in this context invariably run the risk of shading its meaning in a way that is misleading or erroneous. Id. 
¶141 In the 2010 Mitchell decision, we found that the court, prosecutor and defense counsel had all used the terms "meaningful consideration" "consideration" and "consider" interchangeably. We held there was no indication the term caused any confusion among potential jurors. 2010 OK CR 14, ¶ 32, 235 P.3d at 650. Mitchell merely cautioned against defining terms which have a commonly understood meaning. It did not state that doing so was error.
¶142 In the present case, defense counsel provided a nearly identical definition as that of the prosecutor who said to prospective jurors, "you must deliberate with other jurors, and that's talk to them." Here, we find no error and thus no plain error in the prosecutor's statement as there is no indication the term caused any confusion among potential jurors or that it affected the way potential jurors answered questions regarding the three punishment options.
¶143 Appellant next asserts that in first stage closing argument, the prosecutor misstated the testimony of Dr. Hahn by telling the jury that Dr. Hahn testified that the decedent wouldn't take a "header" but she would "wilt"; that he would expect lacerations to be smooth if she fell on the floor and the three scars found at the autopsy were consistent with this testimony; and that if the decedent had done a "header" he would expect broken bones in her arms.
¶144 We have long allowed counsel for the parties "a wide range of discussion and illustration" in closing argument. Sanchez, 2009 OK CR 31, ¶ 71, 223 P.3d 980, 1004 (citing Hamilton v. State, 1944 OK CR 69, 79 Okla.Crim. 124, 135, 152 P.2d 291, 296). Counsel enjoy a "right to discuss fully from their standpoint the evidence and the inferences and deductions arising from it." Id. We will reverse the judgment or modify the sentence only where grossly improper and unwarranted argument affects a defendant's rights. Id. 
¶145 There was considerable discussion between both counsel and Dr. Hahn on what type of fall it would take to produce the injuries seen in the decedent. Dr. Hahn noted that typically when a person falls, they "catch" themselves with their hands or have other injuries; "unless they have something called syncope where they pass out and they're unable to get their arms out in front of them. A lot of people when they pass out, they just slump. So usually they don't have that type of head injury." There was no evidence that the decedent suffered from syncope disorder.
¶146 On re-direct, Dr. Hahn testified that the injuries he saw on the decedent were more than he would expect from a fall in the home. He said that even considering the decedent's heart condition, it was a rare case for a person with a heart condition to just fall straight forward to the ground. He explained that "oftentimes people like that will wilt"; by wilting he explained that "if you're standing there they just kind of fall to their knees and then - either to their side". On cross-examination, Dr. Hahn was asked if a family member had reported being with the decedent when "perhaps she wilted", whether she complained of chest pains and was rushed to the hospital for a heart condition, and "would that impact at all on your opinion today?" Dr. Hahn responded, "my opinion thus far is just that there was a woman with a head injury." When asked "would she be more susceptible perhaps to falling if that was her situation?" the doctor responded, "it still typically doesn't look like that."
¶147 The prosecutor's argument contained reasonable inferences from Dr. Hahn's testimony. As the prosecutor noted, she recalled Dr. Hahn's testimony differently than defense counsel. While there was a misstatement or two of the testimony, these were minor misstatements which did not mislead the jury and could not have affected the outcome of the trial. See Bland v. State, 2000 OK CR 11, ¶ 102, 4 P.3d 702, 728. The majority of the argument was well within the wide latitude permitted in closing argument.
¶148 Appellant also asserts the prosecutor improperly argued that the decedent would "tell [ ] anybody that asked her" that Appellant was her attacker. Appellant calls this a gross misstatement of the evidence in light of Detective Helm's affidavit in support of the arrest warrant that the only thing the decedent said at the scene was that she had to go to the bathroom, and two sources which he seeks to have added to the record through Rule 3.11.
[4] 
¶149 Initially, the prosecutor's comment was, "[y]ou have the single-most important piece of evidence you could possibly have in the fact that Connie Frederick, the deceased in this case, told you this wasn't a fall. She told you through telling anybody that asked her at the scene before she got to the hospital that her son had done this."

¶150 Further, none of the evidence now relied upon by Appellant was admitted at trial. Detective Helm did not testify and the referenced affidavit was not admitted into evidence, nor were the alleged statements of Tobias Frederick and Da'Jon Diggs. Evidence which was admitted included testimony from Ms. Diggs and Paramedic Simmons that the decedent identified Appellant as her attacker. The prosecutor's comment was a reasonable inference and not a gross misstatement. We find no error and thus no plain error in the prosecutor's statement.
¶151 The next group of challenged statements is from capital sentencing closing argument. First, Appellant contends the prosecutor improperly argued that the enormity of killing one's own mother was an aggravating circumstance. Reading the challenged comments in context, we find no error and thus no plain error. The jury was instructed on the alleged aggravating circumstances and killing one's own mother was not included as an aggravating circumstance. The prosecutor argued that the evidence in the case showed that Appellant struck his mother in the head with an object resulting in injuries severe enough to cause her death less than three weeks later and that this evidence was sufficient to support the alleged aggravator of heinous, atrocious or cruel. We do not read these comments to be an expression of personal opinion but as reasonable conclusions based on the evidence. "In the sentencing stage of a capital trial, aggravating and mitigating circumstances are to be discussed. The prosecution has the right, to not only discuss the evidence from his standpoint and all the reasonable inferences arising therefrom, but also to argue the evidence in aggravation. Paxton v. State, 1993 OK CR 59, ¶ 70, 867 P.2d 1309, 1330.
¶152 Appellant next argues the prosecutor gave an inaccurate account of the weighing process by telling the jury that in determining whether the aggravating circumstances outweigh the finding of one or more of the mitigators, to consider the grace and love exhibited by Appellant's family when it allowed him to move back into the family home. Appellant asserts the argument asked the jury to incorporate an irrelevant factor into the weighing process, much like calling for victim impact evidence to be improperly used in the weighing process.
¶153 Reading the prosecutor's argument in context, she argued that the evidence offered by the defense in mitigation, should not mitigate Appellant's punishment. She contrasted evidence of Appellant's violent past with the generosity his family had shown him and then asked the jury to consider how Appellant repaid that generosity. We will not require counsel in such serious cases "to address the jury with lifeless and timid recitations void of moral reflection or persuasive power." Sanchez, 2009 OK CR 31, ¶ 75, 223 P.3d at 1005. The prosecutor reminded the jury they had to find the aggravating circumstances outweighed the mitigating factors and that the evidence supporting the aggravators outweighed the mitigating evidence. The jurors were well aware that the statements of counsel were not evidence and were intended to persuade the jury during its deliberations. We find no error in these comments, and thus no plain error.
¶154 Appellant asserts the prosecutor erred in telling the jury that they were there to do justice for the victim, and not for Appellant. He argues this is a misstatement of the law which this Court has characterized as "fundamental error." During the second portion of the sentencing closing argument, the prosecutor commented that "[w]e're not here to do justice for him. He is not why we're here. We're here to do justice for Connie Frederick. That's why we're here."
¶155 It is improper for prosecutors to ask jurors to have sympathy for victims. Warner v. State, 2006 OK CR 40, ¶ 190, 144 P.3d 838, 890; Jones v. State, 1987 OK CR 103, ¶ 15, 738 P.2d 525, 529; Tobler v. State, 1984 OK CR 90, ¶ 16, 688 P.2d 350, 354. "It is clearly improper for a prosecutor to make arguments which tend to 'divert the jury from its duty to decide the case on the evidence.'" Jones, 1987 OK CR 103, ¶ 17, 738 P.2d at 530. However, such comments standing alone usually do not warrant reversal. In Tobler, the conviction was reversed based upon numerous instances of misconduct. 1984 OK CR 90, ¶ 28, 688 P.2d at 356. Here, the comment was inappropriate. We review such comments within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel. Simpson v. State, 2010 OK CR 6, ¶ 26, 230 P.3d 888, 899. Given the strength of the State's evidence against Appellant we find that the inappropriate comment did not deprive Appellant of a fair trial or affect the jury's assessment of punishment. There was no plain error here.
¶156 Finally, Appellant asserts the prosecutor denigrated the mitigating evidence by arguing that putting Appellant in prison is a reward in light of the mitigation evidence, that the jury should not consider mitigation, that mitigation was an excuse and that they should not feel guilty in light of the mitigation offered. Appellant relies in part on Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) wherein the United States Supreme Court stated that persuading the sentencer to ignore mitigating evidence is error.
¶157 Reading the challenged comments in context of the entire closing argument, we find they fall within the broad parameters of effective advocacy. The prosecutor has the right to discuss evidence during the second stage in arguing for an appropriate punishment. Warner, 2006 OK CR 40, ¶ 192, 144 P.3d at 890. The prosecutor may properly attempt to minimize the effect of the evidence presented by the defense. Id. 
Here, the prosecutor did not denigrate the mitigating evidence or tell the jury to ignore the evidence offered in mitigation. The prosecutor's argument merely attempted to minimize the effect of the evidence presented by the defense. Several of the comments were invited by defense counsel's closing argument. See Pickens v. Sate, 1993 OK CR 15, ¶ 63, 850 P.2d 328, 343 (the prosecution has the right to respond to arguments made by defense counsel in their closing argument). Further, the jury was appropriately instructed as to the mitigating evidence and was not in any way precluded from considering any and all mitigating evidence. Accordingly, we find no error and thus no plain error.
CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL 
¶158 In Proposition XX, Appellant asserts he was denied the effective assistance of counsel. This Court reviews ineffective assistance of counsel claims under the two-part test mandated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Malone v. State, 2013 OK CR 1, ¶ 14, 293 P.3d 198, 206. The Strickland test requires an appellant to show: (1) that counsel's performance was constitutionally deficient; and (2) that counsel's deficient performance prejudiced the defense. Id. Unless the appellant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." Id. 
¶159 The Court begins its analysis with the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Id., 2013 OK CR 1, ¶ 15, 293 P.3d at 206 (citing Strickland, 466 U.S. at 689, 104 S.Ct. at 2065). Appellant must overcome this presumption and demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. Id. This Court has stated that the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. Id., 2013 OK CR ¶ 15, 293 P.3d at 206-207.
¶160 Appellant first finds counsel ineffective for failing to file a motion in limine to exclude the decedent's alleged hearsay statements. Appellant argues that as demonstrated in Propositions IV and V, the decedent's statements should not have been admitted as they violated the Confrontation Clause. Appellant asserts that if the erroneously admitted hearsay had not been admitted, there is a reasonable probability the outcome of the trial would have been different.
¶161 In Propositions IV and V we addressed the admissibility of the decedent's statements through Da'Jon Diggs and Paramedic Simmons. After a thorough analysis we found the statements were non-testimonial hearsay and their admission did not violate the federal Confrontation Clause. We further found the statements properly admissible pursuant to state law under the hearsay exceptions for an excited utterance and statements made for medical treatment.
¶162 When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. Id., 2013 OK CR 1, ¶ 16, 293 P.3d at 207 (citing Strickland, 466 U.S. at 697, 104 S.Ct. at 2069). To demonstrate prejudice an appellant must show that there is a reasonable probability that the outcome of the trial would have been different but for counsel's unprofessional errors. Id. "'The likelihood of a different result must be substantial, not just conceivable.'" Id., (quoting Harrington v. Richter, 562 U.S. 86, 112, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011)). Here, as the statements were properly admitted, we find Appellant was not prejudiced by counsel's failure to file a motion in limine. 
¶163 Appellant next argues counsel was ineffective for failing to investigate or present evidence on potential causes for the injuries to Appellant's hand. When located by police the day after the assault, Appellant's right hand was swollen and his fingernail was bleeding. Appellant made statements to the effect that his hand was swollen due to gout and he had cut his finger at work. Appellant argues that counsel had a duty to conduct a reasonable investigation to find evidence that could be used to support a defense or discredit a piece of the State's evidence. The evidence supporting this claim of error is included in the Notice of Extra-Record Evidence Supporting Propositions XV, XIX, and XX of the Brief of Appellant and Rule 3.11 Motion to Supplement Direct Appeal Record and Request for an Evidentiary Hearing tendered for filing contemporaneously with the appellate brief. 
¶164 Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2017) allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to utilize available evidence which could have been made available during the course of trial. Warner, 2006 OK CR 40, ¶ 207, 144 P.3d at 893. Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence. Id. See also Grissom, 2011 OK CR 3, ¶ 80, 253 P.3d at 995; Simpson v. State, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-906.
¶165 Appellant refers us to Attachment E to his motion. This is a signed affidavit from David Dicus, an Investigator with the Oklahoma County Public Defender's Office. Mr. Dicus states that upon the request of appellate counsel he interviewed Keith Prince also known as Keith Elliott to see if he remembered anything about an injury to Appellant's finger or hand in the time frame related to the decedent's death. Mr. Dicus stated that Mr. Elliott told him "that it was a long time ago but he did vaguely remember [Appellant] cutting his hand or his finger in the course of helping him with the horses and/or tending the property. He could not remember any specifics or great detail because of the time that has passed." (Affidavit of David Dicus, Attachment E).
¶166 In order to meet the clear and convincing standard set forth above, Appellant must present this Court with evidence, not speculation, second guesses or innuendo. Lott v. State, 2004 OK CR 27, ¶ 136, 98 P.3d 318, 351. The affidavit from Mr. Dicus contains unreliable, hearsay information which is admittedly not specific. We have said that "[w]e will not hold counsel ineffective for failing to investigate every possible avenue of defense; counsel may make strategic choices based on less than complete investigation, which will be considered reasonable to the extent that reasonable professional judgment supports the limitations on investigation." Browning, 2006 OK CR 8, ¶ 20, 134 P.3d at 833. The affidavit of Mr. Dicus fails to present clear and convincing evidence that there is a strong possibility trial counsel was ineffective for failing to investigate and present further evidence of potential causes for the injuries to Appellant's hand. Therefore, the motion to remand for an evidentiary hearing on this ground is denied.
¶167 Regarding the claim of ineffectiveness raised in the appellate brief concerning counsel's failure to investigate and present further evidence of potential causes for the injuries to Appellant's hand, Appellant has not shown trial counsel to be ineffective under the more rigorous federal standard set forth in Strickland for ineffective assistance of counsel. See Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905-906.
¶168 Appellant argues further that "a simple Google search supports the contention that gout can settle in a person's hand." It is not clear whether Appellant is arguing that defense counsel failed to conduct such a search of the issue or if he is asking this Court to conduct such a search. If Appellant wants to put the results of an internet search before this Court, he must follow our court rules and include such in a motion to supplement. Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2017). Appellant has not done so. Further, there was no evidence that Appellant actually suffered from gout. Therefore, we find Appellant has failed to show that he was prejudiced by the absence of any evidence regarding the effects of gout on a person's hands.
¶169 Appellant finds counsel ineffective for failing to thoroughly cross-examine Da'Jon Diggs and Tobias Frederick with available impeachment evidence. Appellant refers us to Proposition V where inconsistencies between the testimony of Ms. Diggs and Paramedic Simmons were addressed. He asserts that counsel failed to argue these inconsistencies to the jury. Our review of the record shows that both Ms. Diggs and Mr. Simmons testified that the decedent identified Appellant as her attacker. Ms. Diggs testified that the decedent made the sign for "D" which was her sign for Appellant and Mr. Simmons testified that Ms. Diggs told him the decedent said her "son" attacked her. As Appellant was the only one of the decedent's sons present at the time of the attack, there does not appear to be any inconsistency between the testimony of Ms. Diggs and Paramedic Simmons. Further, as Appellant was identified by other witnesses as the assailant, we will not find counsel ineffective for belaboring the exact nomenclature used to identify Appellant.
¶170 Appellant also finds counsel ineffective for failing to impeach Ms. Diggs and Tobias Frederick regarding the decedent's history of falling, that on a previous occasion the decedent had hit one of Diggs' aunts in the head with a brick and that Diggs had her cell phone on her that day. To support this argument, Appellant directs us to his motion for evidentiary hearing and Attachment A, a DVD copy of a police interview with Ms. Diggs and Attachment B, a DVD copy of a police interview with Tobias Frederick. Having reviewed these interviews with police, we find they do not provide clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize the evidence.
¶171 Ms. Diggs was cross-examined about the decedent's history of falling. Ms. Diggs maintained that the decedent did not have fainting spells, but admitted that at Preliminary Hearing she had testified that the decedent had fainted two years earlier. Mr. Frederick did not testify regarding whether the decedent had a history of falling. That he said during the police interview that he had seen her trip on occasion does not impeach his testimony. Further, Ms. Diggs testified that she had her cell phone the day of the attack, but she left it in the house when Appellant chased her outside. We fail to see any relevance in any statement by Ms. Diggs that the decedent had previously hit a family member with a brick.
¶172 Appellant also directs us to Attachment C, information and police reports in the prosecution of Jerome Frederick for domestic abuse of Ms. Diggs and the decedent. Appellant claims that Jerome Frederick (his brother) told police that Ms. Diggs made up the allegations of abuse to keep him away from the decedent's house. Appellant claims this was a recurrent theme in his case and the information from Jerome Frederick's case would have impeached Ms. Diggs' testimony that Appellant struck the decedent.
¶173 The records provided by Appellant show that Jerome Frederick told police that in his case, the assault occurred because Ms. Diggs wanted to keep him away from the decedent, whom he later assaulted. There is nothing in the information about Ms. Diggs making up the assault claim against Jerome Frederick. Further, the information about Jerome Frederick's case was not relevant in the prosecution of Appellant. Ms. Diggs was thoroughly cross-examined by defense counsel as to whether she was telling the truth when she said Appellant was the assailant and why she claimed he was the assailant.
¶174 Having thoroughly reviewed Appellant's motion, we find the information contained in Attachments A, B, and C do not provide clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to use the complained-of evidence. The motion to remand for an evidentiary hearing on these grounds is DENIED. 
¶175 Regarding the claim raised in the appellate brief, this case is distinguishable from Glossip v. Sate, 2001 OK CR 21, 29 P.3d 597 relied upon by Appellant. In Glossip, the appellant met his 3.11 burden and the case was sent back for an evidentiary hearing. This Court affirmed the trial court's finding that counsel was ineffective for failing to utilize important impeachment evidence against Justin Sneed, upon whose testimony the State's case entirely relied. Id., 2001 OK CR 21, ¶19, 29 P.3d at 602. The State's case against Appellant did not rely entirely upon the testimony of Ms. Diggs. The evidence now relied upon by Appellant was not important impeachment evidence which if heard by the jury would have altered the outcome of the trial.
¶176 Appellant next asserts that counsel was not acting as his advocate when he informed the jury during first stage opening statement that Appellant was a multiple convicted felon who had been institutionalized. Appellant claims he was never consulted on the decision to proceed in that manner. Appellant further finds counsel ineffective for telling the jury at different times in the trial that he was hard to get along with, had issues with women, refused to cooperate in testing and acted like an "ogre". He complains that in first stage closing argument, counsel said that convicting Appellant of the assault and battery of Ms. Diggs "was easy" and that during second stage closing argument, he gratuitously conceded the alleged aggravating circumstances, although stating that he didn't think he would check as many boxes as the prosecutor had.
¶177 "Counsel must act as an advocate and subject the State's case to adversarial testing." Malicoat, 2000 OK CR 1, ¶ 48, 992 P.2d at 405. "Appellant must overcome the strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance and equaled sound trial strategy". Id. This Court will consider whether, viewing counsel's challenged conduct on the facts of the case as seen at the time, it was professionally unreasonable. Id. 
¶178 In opening statement, defense counsel, a seasoned capital practitioner, told the jury about Appellant's past - that much of it had been spent in prison, he was not the favorite son or favorite sibling and he had spent time in juvenile homes. Counsel explained that despite this history, Appellant had family who loved and cared for him and let him move into their home when he had no place to live. Counsel admitted that Appellant had picked up some bad habits in his life and that due to spending most of his life in prison, did not know how to relate to women. Counsel explained how his time in prison caused him and Ms. Diggs not to get along and helped to make him possessive of things like food. Counsel told the jury it was important for them to understand the "dynamics of what's going on in this family".
¶179 The decision regarding the legal arguments to be made is a matter of trial strategy. Short, 1999 OK CR 15, ¶ 87, 908 P.2d at 1107. We will not second guess trial strategy on appeal. Id. Counsel has an obligation to use reasonable professional judgment in making decisions concerning the defendant's case. Lott, 2004 OK CR 27, ¶ 162, 98 P.3d at 356. This is not to say that counsel is to make all of the decisions in the case. Id., 2004 OK CR 27, ¶ 164, 98 P.3d at 357. It is the defendant's case and while counsel has the responsibility to advise, inform, and consult with the defendant, the defendant has the right be involved in the decision process that will affect his or her life. Id. 
¶180 Here, there is no indication that at trial Appellant disagreed with counsel's decisions on how to proceed with the case. Defense counsel took his first opportunity to humanize Appellant before the jury and to put into the defense's perspective, evidence the jury was going to hear. This was reasonable trial strategy.
¶181 In first stage closing argument, counsel did say that finding the defendant guilty of "assault and battery" of Ms. Diggs would be "easy". However, when read in context, this was not a concession of guilt. Counsel vigorously questioned Ms. Diggs' credibility and motive. It was in this vein that counsel said, referring to Ms. Diggs, "I think it's remarkable that a person who was in fear of her life and in fear and running from a big old ogre like [Appellant] that she's very matter of fact. By the way send the police out here. She's done that before." Counsel told the jury they should believe the testimony of one of the witnesses who saw Appellant chase Ms. Diggs outside that Appellant did not assault Diggs. Further, counsel's emphasis in closing argument was to prevent a conviction on the most serious of the charges, first degree murder. He argued that even if the evidence allowed for an easy finding of guilt as to the assault and battery charge, it did not allow for a similar easy finding of guilt for first degree murder. Counsel's remarks were not a concession of guilt, but reasonable trial strategy to maintain credibility with the jury.
¶182 In capital sentencing closing argument, counsel did not concede the aggravating circumstances. Leading up to the challenged comment, he referenced the jury instructions and the prosecutor's coverage of them in her closing argument. Counsel in effect said that under the evidence, he had no disagreement with the list of aggravating circumstances sent to the jury for their consideration. However, throughout his argument, counsel challenged the evidence supporting the alleged aggravators, reminded the jury that the decision to find the existence of an aggravating circumstance was a group decision and that it must be unanimous. He further reminded them that even if they were to find the existence of an aggravator, they were then only authorized to consider the death penalty, they were not required to return a death sentence.
¶183 Contrary to Appellant's contention, counsel's argument was not a concession to the existence of the aggravators or that the death sentence was a foregone conclusion. Counsel went on to argue that the mitigating evidence outweighed the aggravating and therefore the death penalty was not warranted. Counsel concluded by stating that "perhaps [Appellant] could make a life in prison for himself where he's made a life for himself in the past. Maybe life is enough." During the sentencing stage of trial, arguing for the lightest possible sentence is certainly a sound tactical choice on counsel's part. 
¶184 Appellant next asserts counsel failed to subject the State's evidence of the prior acquitted conduct to any meaningful adversarial testing. Defense counsel raised an objection to admission of the evidence but was overruled. The State presented two witnesses, Antonio Jackson and Tammie Brookins, who testified to the facts of the incident at the hair salon. Appellant now argues defense counsel should have called witnesses who testified in the prior trial that there was no evidence corroborating the State's witnesses and that he should have offered the transcript of the testimony of Letava Williams, a defense witness who was deceased by the time of the instant trial. Appellant criticizes defense counsel for not knowing that Ms. Williams was deceased.
¶185 As part of his Rule 3.11 motion, Appellant includes an affidavit from Willie Germany, Chief Investigator with the Oklahoma County Public Defender's Office, who states that he was able to determine that Ms. Williams passed away in 2009 and that she is the same person called as a defense witness in the prior trial for crimes arising out of the incident at the hair salon. (Affidavit of Willie Germany, Attachment D).
¶186 Appellant also includes Attachment G, a copy of Ms. Williams' prior testimony. In the trial of the 2003 charges, Ms. Williams testified that people in the hair salon were talking about Appellant. She said Appellant had been very nice to her, and she thought all of the talk about him was unnecessary. She did not specify the nature of the talk but said the atmosphere in the salon made her uncomfortable. On cross-examination, she testified that was her first visit to the salon. She said she never heard anyone threaten Appellant, that Appellant was minding his own business, she did not know Appellant or anyone in the salon except for her hairdresser and that she left before the acts on trial occurred.
¶187 Appellant has not shown by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to know that Ms. Williams was deceased or for failing to offer her prior testimony. Ms. Williams had left the salon by the time Appellant threatened and assaulted the others. Her testimony would not have contradicted that of Jackson and Brookins as to Appellant's conduct at the time of the assaults. The motion to remand for an evidentiary on this ground is DENIED.
¶188 As for the claim raised in the appellate brief, Appellant asserts that in the original trial of the incident at the hair salon, the State called nine witnesses, including four police officers. Appellant asserts that in the trial for his mother's death, defense counsel should have called the officers responding to the hair salon who allegedly testified in the previous trial there was no corroborating evidence of Appellant's guilt. Appellant also asserts that once the previous jury came back with 13 not guilty verdicts, the State dismissed the charge of possession of firearm after former conviction of a felony. Appellant asserts this should have been introduced as an admission by party opponent that the evidence was not credible enough to proceed to a jury.
¶189 It is easy with hindsight to argue that trial counsel should have essentially sought to retry the 2003 hair salon case. However, it is not clear if the trial judge would have allowed it or if it would have been the best use of counsel's time and resources. Evidence of the incident at the hair salon in 2003 was properly admitted as acquitted conduct in support of the continuing threat aggravating circumstance. The best response to the State's evidence was that Appellant's conduct did not result in a criminal conviction. The jury heard just such testimony. Would it have made a difference in the jury's finding of the aggravating circumstance if they heard from more than one witness that Appellant had been acquitted of the criminal charges associated with the hair salon incident, or that witnesses in that previous trial did not corroborate the testimony of the witnesses the State chose to testify to the acquitted conduct? We can't say. What we can say is that the acquitted conduct evidence was only a part of the evidence introduced to support the continuing threat aggravating circumstance. The jury also heard evidence of nine instances of Appellant's prior use or threats of violence.
¶190 The claim that appellate counsel would have treated the acquitted conduct differently does not make trial counsel ineffective. See Shultz v. State, 1991 OK CR 57, ¶ 9, 811 P.2d 1322, 1327 ("[t]he fact that another lawyer would have followed a different course during the trial is not grounds for branding the appointed attorney with the opprobrium of ineffectiveness", citing Williams v. Beto, 354 F.2d 698, 706 (5th Cir.1965)). Absent a showing of incompetence, the Appellant is bound by the decisions of his counsel and mistakes in tactic and trial strategy do not provide grounds for subsequent attack. Id. 
¶191 Counsel's decision not to highlight further the acquitted conduct evidence by choosing not to put on additional witnesses to testify to the conduct was a reasonable strategic decision. Further, we are not convinced that introducing any other evidence concerning the acquitted charges would have made the jury less likely to find the existence of the continuing threat aggravator. Therefore we find Appellant has failed to meet the more rigorous Strickland standard of ineffectiveness as he has not shown any prejudice by counsel's defense of the continuing threat aggravator and more specifically, counsel's failure to further challenge the State's acquitted conduct evidence.
¶192 Appellant next directs our attention to counsel's failure to call Dr. Art Williams to testify. During capital sentencing stage opening statement, defense counsel told the jury that he would present testimony from Dr. Art Williams, a sociologist, who would tell the jury about Appellant and his life. However, defense counsel rested his case without calling the witness. At the close of evidence, defense counsel explained to the court that he was not calling Dr. Williams to testify as Appellant never "interacted" with the doctor. Counsel said that Dr. Williams reported that the two were in the same room, but Appellant refused to talk or participate in any testing. Counsel explained that Dr. Williams would testify that Appellant was institutionalized but that evidence had already come in, "so, I don't think we need a sociologist to tell us something that's obvious." Counsel also admitted he was worried about the prosecutor's cross-examination of the witness. Counsel informed the court he had fully intended to call the doctor but decided that day not to for strategic reasons.
¶193 Now on appeal, Appellant complains that counsel's decision not to call the witness to testify after telling the jury he would do so was not reasonable trial strategy. Appellant argues that counsel should have known of his concerns before telling the jury it would hear from the witness.
¶194 The record shows that counsel's decision not to call the witness was based in part on Appellant's failure to cooperate but also on counsel's realization of the intense scrutiny the witness would have been placed under during cross-examination. The prosecutor affirmed counsel's concerns by informing the court that she was prepared to cross-examine and impeach the doctor on specific points and that she was planning on calling a witness to impeach and refute Dr. Williams' testimony. Defense counsel informed the court he was worried that through these experts, the jury would hear that Appellant had been previously acquitted of murder.
¶195 Based upon this record, counsel's decision not to call the witness, despite his comment in opening statements, was reasonable trial strategy. We recognize that counsel may, at times, have legitimate reasons for not calling certain witnesses to testify. Smith v. State, 1982 OK CR 143, ¶ 21, 650 P.2d 904, 908. The decision of which witness to call at trial is one of strategy best left to counsel, and generally will not be second-guessed on appeal. Id. 
¶196 The record shows that Dr. Williams was a sociologist who would have testified to Appellant's background. As defense counsel told the trial court, much of what Dr. Williams would have testified to was already before the jury in the form of testimony from other witnesses. Not calling Dr. Williams to testify appears to have forced the prosecution in part to alter its course at trial. That the witness was not called to testify was easily explained in closing argument. Appellant has not shown that counsel's failure to call the witness to testify after stating he would was in any way held against the defense. Based upon the record before us, Appellant has failed to show any prejudice.
¶197 Appellant further finds counsel ineffective for failing to request additional peremptory challenges during voir dire and failing to identify unqualified jurors whom he would have struck with his additional challenges. As we addressed in Proposition I, there is no evidence to suggest that an unfit juror sat on Appellant's jury or that the result of the trial would have been any different had defense counsel requested, received and exercised additional peremptory challenges. Therefore, Appellant has failed to show any prejudice and this claim of ineffectiveness is denied. See Young v. State, 1998 OK CR 62, ¶¶ 71-72, 992 P.2d 332, 347.
¶198 Finally, Appellant finds counsel ineffective for failing to object to errors at trial and request admonishments. Rather than repeating his arguments, Appellant merely lists them and requests they be reviewed as violations of the Sixth and Fourteenth Amendments to the United States Constitution as well as for plain error. These allegations include: 1) counsel's failure to object to capital sentencing prosecutorial misconduct, see Proposition XIX; 2) counsel's failure to object to the alleged hearsay statement of the decedent identifying Appellant as her attacker and the alleged hearsay statements of Natalie Patterson, see Proposition IV; 3) counsel's failure to object to improper opinion testimony of Paramedic Simmons, see Proposition VII; and 4) counsel's failure to object to the prosecution's flight argument or request proper instructions, see Proposition IX.
¶199 We have addressed each of these claims in this opinion and found no error warranting relief. Therefore, any objections by the trial court would have been denied. We have repeatedly held that we will not find counsel ineffective for failing to raise objections which would have been denied. Eizember, 2007 OK CR 29, ¶ 155, 164 P.3d at 244.
¶200 Having thoroughly reviewed Appellant's Notice of Extra-Record Evidence Supporting Propositions XV, XIX, and XX of the Brief of Appellant and Rule 3.11 Motion to Supplement Direct Appeal Record and Request for an Evidentiary Hearing, and accompanying affidavits, we find he has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to investigate further and utilize the complained-of evidence.
[5] We decline to grant Appellant's application for an evidentiary hearing on Sixth Amendment grounds. We also deny his motion to supplement the record. 
¶201 Additionally, after thoroughly reviewing the record, and Appellant's allegations of ineffectiveness, we have considered counsel's challenged conduct on the facts of the case as viewed at the time and have asked if the conduct was professionally unreasonable and, if so, whether the error affected the jury's judgment. Warner, 2006 OK CR 40, ¶ 206, 144 P.3d at 893. Defense counsel's performance in this case did not "so undermine the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id., quoting Strickland, 466 U.S. at 686, 104 S.Ct. at 2064. Appellant has failed to meet his burden of showing a reasonable probability that, but for any unprofessional errors by counsel, the result of the trial would have been different as any errors or omissions by counsel did not influence the jury's determination of guilt or decision to impose the death sentence. Accordingly, we find that Appellant was not denied the effective assistance of counsel and this proposition of error is denied.
ACCUMULATION OF ERROR CLAIM
¶202 In Proposition XXI, Appellant asserts that cumulative error warrants a new trial or a modification of his sentence. A cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. Warner, 2006 OK CR 40, ¶ 223, 144 P.3d at 896. However, when there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. Id. While certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied Appellant a fair trial. Therefore, no new trial or modification of sentence is warranted and this proposition of error is denied.
MANDATORY SENTENCE REVIEW
¶203 In his Proposition XXII, Appellant contends his sentence should be modified under our mandatory sentence review. He argues his death sentence was rendered arbitrarily in this case as a result of passion and prejudice caused by all of the foregoing errors. Appellant further argues his execution would violate the Eighth Amendment prohibition against cruel and unusual punishment.
¶204 Pursuant to 21 O.S.2011, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.2011, § 701.12. Turning to the second portion of this mandate, the jury found the existence of three aggravating circumstances: 1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; 2) the murder was especially heinous, atrocious and cruel; and 3) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.2011, § 701.12(1)(4)(7).
¶205 In Proposition XIII, we found the evidence sufficient to support the prior violent aggravator. In Proposition XIV, we found the evidence sufficient to support the aggravating circumstance of heinous, atrocious or cruel.
¶206 To support the aggravator of continuing threat, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future. Davis, 2011 OK CR 29, ¶ 136, 268 P.3d at 122. To prove this aggravating circumstance, the State may present any relevant evidence, in conformance with the rules of evidence, including evidence from the crime itself, evidence of other crimes, admissions by the defendant of unadjudicated offenses or any other relevant evidence. Id. A finding that the defendant would commit criminal acts of violence that would constitute a continuing threat to society is appropriate when the evidence establishes the defendant participated in other unrelated criminal acts and the nature of the crime exhibited the calloused nature of the defendant. Id. The continuing threat aggravator is aimed at the defendant's future conduct. Ryder v. State, 2004 OK CR 2, ¶ 66, 83 P.3d 856, 871. To establish continuing threat, the State must show a pattern of criminal conduct that will likely continue in the future. Id. 
¶207 In support of this aggravator the State presented evidence of Appellant's juvenile conviction in 1972 for Robbery with Firearms, the details of his 1981 conviction for First Degree Burglary, and his 2003 conduct at the hair salon leading to the filing of criminal charges. The State also offered evidence that in 2006, Appellant beat his sister Karen Frederick. Witnesses testified that Appellant attacked her, hit her in the jaw and dislocated it, grabbed her crutches and beat her with them, and stomped and kicked her while she was on the ground. Other evidence showed that sometime after that attack, Appellant assaulted Ms. Frederick's grandson, hitting him in the head, choking and strangling him. Evidence also showed that in 2006 or 2007, Appellant physically threatened and attacked a ten year old friend of Ms. Diggs and in 2010 he turned a visit with his neighbor into a violent encounter when in the absence of any provocation, he attacked and beat the woman, repeatedly punching her in the face with his fists.
¶208 Appellant's criminal history shows a pattern of escalating violence. This evidence, combined with the evidence of the bludgeoning of the decedent, overwhelmingly supports the aggravator as establishing the existence of a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society. See Davis, 2011 OK CR 29, ¶ 139, 268 P.3d at 122-23.
¶209 Evidence offered in mitigation showed that Appellant was raised in a strict, church going family. However, as he grew older, his father was gone from the family for long periods of time and Appellant was exposed to certain negative influences from which he had previously been protected. Evidence showed that Appellant was easily led by others, immature in many ways and slow to understand things. When he 14 years old he rebelled against his father and left home. He found he was not equipped to take care of himself and returned home, however his father thereafter did not take an interest in him. When he was 14 or 15 years old, he was involved in a car wreck and hit his head on the windshield. His father thought he was never the same after that. His father thought Appellant would have benefitted from juvenile rehabilitation programs after his robbery conviction but he was never given the opportunity. Evidence showed that being institutionalized made Appellant suspicious of others and overly aggressive, that he has never learned to live as a free man and is unable to cope with stress and the strain of society. This evidence was summarized and presented to the jury in Instruction No. 15 along with any other mitigating evidence the jury might find existed.
¶210 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.2011, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, this appeal is denied.
DECISION
¶211 The JUDGMENTS and SENTENCES are AFFIRMED. The motions to Supplement the Record and Remand for Evidentiary hearing on Sixth Amendment grounds are DENIED.
[6] Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2017), the MANDATE is ORDERED issued upon the delivery and filing of this decision.
AN APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE TIMOTHY R. HENDERSON, DISTRICT JUDGE




APPEARANCES AT TRIAL

APPEARANCES ON APPEAL

 
 


JAMES T. ROWAN

GINA K. WALKER


TIM WILSON

ASSISTANT PUBLIC DEFENDER


ASSISTANT PUBLIC DEFENDERS

320 ROBERT S. KERR, STE. 611


320 ROBERT S. KERR, STE. 611

OKLAHOMA CITY, OK 73102


OKLAHOMA CITY, OK 73102

COUNSEL FOR APPELLANT


COUNSEL FOR APPELLANT
 

 
 


DAVID W. PRATER

E. SCOTT PRUITT


DISTRICT ATTORNEY

ATTORNEY GENERAL OF OKLAHOMA


SUZANNE LAVENUE

JOSHUA L. LOCKETT


CLAYTON NIEMEYER

ASSISTANT ATTORNEY GENERAL


ASSISTANT DISTRICT ATTORNEYS

313 N.E. 21st ST.


320 ROBERT S. KERR, STE. 505

OKLAHOMA CITY, OK 73105


OKLAHOMA CITY, OK 73102

COUNSEL FOR THE STATE


COUNSEL FOR THE STATE
 
 
OPINION BY: LUMPKIN, P.J.
LEWIS, V.P.J.: Concur
JOHNSON, J.: Recuse
SMITH, J.: Concur
HUDSON, J.: Concur
FOOTNOTES
[1] Appellant's Petition in Error was filed in this Court on July 6, 2015. His brief was filed February 16, 2016. The State's brief was filed on June 14, 2016. Appellant's reply brief was filed July 5, 2016. The case was submitted to the Court on June 28, 2016. Oral arguments were held on January 17, 2017.
[2] It is for this very reason that I voiced my concern in Mitchell and urged the Court to require a flight instruction in every case where the evidence warranted it. 876 P.3d at 686-687 (Lumpkin, P.J. concur in part/dissent in part). It is only through a proper instruction that jurors can understand how to evaluate flight from the scene.
[3] Appellant asserts that the officers interjected evidentiary harpoons into their testimony. However, his argument is not fully developed, his citation to the record is inaccurate and his supporting case is found only in a footnote. Under our rules, this claim is not properly before the Court. Rule 3.5(A)(5), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2017).
[4] In his footnotes 80 and 81, Appellant refers to videotaped interviews of Tobias Frederick and Da'Jon Diggs. These interviews are more fully addressed in Proposition XX.
[5] After the filing of his brief in chief, Appellant tendered for filing a Motion to Stay Proceedings to Allow Supplementation of Appellant's Ineffective Assistance of Counsel claim in his brief-in-chief as well as supplementation of Appellant's 3.11B Motion and a Supplemental Brief of Appellant to Proposition XX. This motion and the filing of the supplemental brief were denied by this Court.
[6] The Clerk of this Court is directed to return the motion to defense counsel and keep a copy for record keeping purposes. Rule 1.13(K), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2017)




 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1988 OK CR 176, 761 P.2d 866, MOORE v. STATE
Discussed
 1991 OK CR 57, 811 P.2d 1322, SCHULTZ v. STATE
Discussed
 1991 OK CR 100, 819 P.2d 270, SMITH v. STATE
Discussed
 1992 OK CR 67, 839 P.2d 667, KENNEDY v. STATE
Discussed
 1993 OK CR 7, 846 P.2d 1124, WOODRUFF v. STATE
Discussed
 1993 OK CR 15, 850 P.2d 328, PICKENS v. STATE
Discussed
 1993 OK CR 56, 876 P.2d 682, MITCHELL v. STATE
Discussed
 1993 OK CR 59, 867 P.2d 1309, PAXTON v. STATE
Discussed
 1994 OK CR 33, 876 P.2d 268, PLANTZ v. STATE
Discussed
 1994 OK CR 40, 876 P.2d 690, SIMPSON v. STATE
Discussed
 1994 OK CR 83, 891 P.2d 586, HAWKINS v. STATE
Discussed at Length
 1995 OK CR 18, 900 P.2d 363, VALDEZ v. STATE
Discussed
 1979 OK CR 51, 595 P.2d 1349, COLE v. PARR
Discussed at Length
 2001 OK CR 5, 21 P.3d 1047, 72 OBJ 858, BLACK v. STATE
Discussed at Length
 2001 OK CR 9, 22 P.3d 702, 72 OBJ 1068, WILLIAMS v. STATE
Discussed
 2001 OK CR 11, 29 P.3d 569, 72 OBJ 1205, WARNER v. STATE
Cited
 2001 OK CR 21, 29 P.3d 597, 72 OBJ 2146, GLOSSIP v. STATE
Discussed at Length
 2002 OK CR 30, 53 P.3d 418, LOCKETT v. STATE
Discussed at Length
 2002 OK CR 31, 61 P.3d 901, FITZGERALD v. STATE
Discussed
 2004 OK CR 1, 84 P.3d 731, HARRIS v. STATE
Discussed at Length
 2004 OK CR 2, 83 P.3d 856, RYDER v. STATE
Discussed
 2004 OK CR 6, 85 P.3d 287, LITTLEJOHN v. STATE
Discussed
 2004 OK CR 27, 98 P.3d 318, LOTT v. STATE
Discussed at Length
 2004 OK CR 29, 98 P.3d 738, MILLER v. STATE
Discussed
 2004 OK CR 31, 100 P.3d 1017, DODD v. STATE
Discussed
 2005 OK CR 15, 120 P.3d 1196, MITCHELL v. STATE
Discussed at Length
 2006 OK CR 5, 128 P.3d 521, JONES v. STATE
Cited
 2006 OK CR 7, 130 P.3d 287, ROJEM v. STATE
Discussed at Length
 2006 OK CR 8, 134 P.3d 816, BROWNING v. STATE
Discussed at Length
 2006 OK CR 19, 139 P.3d 907, HOGAN v. STATE
Discussed at Length
 2006 OK CR 20, 136 P.3d 671, MITCHELL v. STATE
Discussed
 2006 OK CR 27, 139 P.3d 907, HOGAN v. STATE
Discussed
 2006 OK CR 34, 142 P.3d 437, CODDINGTON v. STATE
Discussed at Length
 2006 OK CR 40, 144 P.3d 838, WARNER v. STATE
Discussed at Length
 2006 OK CR 44, 146 P.3d 1141, HEAD v. STATE
Discussed at Length
 2007 OK CR 9, 155 P.3d 796, HANCOCK v. STATE
Discussed
 2007 OK CR 16, 157 P.3d 1155, SMITH v. STATE
Discussed
 2007 OK CR 19, 159 P.3d 272, PAVATT v. STATE
Discussed
 2007 OK CR 27, 164 P.3d 1089, COLE v. STATE
Discussed at Length
 2007 OK CR 29, 164 P.3d 208, EIZEMBER v. STATE
Discussed at Length
 2007 OK CR 43, 172 P.3d 622, BELL v. STATE
Discussed
 2008 OK CR 19, 188 P.3d 208, WILLIAMS v. STATE
Discussed at Length
 2009 OK CR 1, 201 P.3d 869, JONES v. STATE
Discussed
 2009 OK CR 3, 202 P.3d 839, RUTAN v. STATE
Cited
 2009 OK CR 31, 223 P.3d 980, SANCHEZ v. STATE
Discussed at Length
 2010 OK CR 6, 230 P.3d 888, SIMPSON v. STATE
Discussed at Length
 2010 OK CR 14, 235 P.3d 640, MITCHELL v. STATE
Discussed at Length
 2011 OK CR 1, 252 P.3d 214, DAWKINS v. STATE
Discussed
 2011 OK CR 6, 248 P.3d 918, HARMON v. STATE
Discussed at Length
 2011 OK CR 10, 256 P.3d 1002, HARNEY v. STATE
Discussed
 2011 OK CR 12, 252 P.3d 221, UNDERWOOD v. STATE
Discussed
 2011 OK CR 3, 253 P.3d 969, GRISSOM v. STATE
Discussed at Length
 2011 OK CR 17, 254 P.3d 684, CODDINGTON v. STATE
Discussed at Length
 2011 OK CR 26, 270 P.3d 160, MITCHELL v. STATE
Discussed at Length
 2011 OK CR 29, 268 P.3d 86, DAVIS v. STATE
Discussed at Length
 2011 OK CR 30, 267 P.3d 114, POSTELLE v. STATE
Discussed
 2012 OK CR 9, 280 P.3d 337, BUSH v. STATE
Discussed at Length
 2013 OK CR 1, 293 P.3d 198, MALONE v. STATE
Discussed at Length
 2013 OK CR 5, 298 P.3d 1192, STATE v. DELSO
Discussed
 2013 OK CR 14, 306 P.3d 557, SMITH v. STATE
Discussed
 2013 OK CR 19, 315 P.3d 392, LEVERING v. STATE
Discussed
 2016 OK CR 3, 371 P.3d 1100, MARTINEZ v. STATE
Discussed at Length
 2016 OK CR 5, 371 P.3d 1120, JACKSON v. STATE
Discussed at Length
 2000 OK CR 1, 992 P.2d 383, 71 OBJ 142, Malicoat v. State
Discussed at Length
 2000 OK CR 11, 4 P.3d 702, 71 OBJ 1304, Bland v. State
Discussed at Length
 1944 OK CR 69, 152 P.2d 291, 79 Okl.Cr. 124, Hamilton v State
Discussed
 1982 OK CR 51, 645 P.2d 1390, PYLE v. STATE
Discussed at Length
 1982 OK CR 128, 650 P.2d 54, BREWER v. STATE
Discussed at Length
 1982 OK CR 143, 650 P.2d 904, SMITH v. STATE
Discussed
 1997 OK CR 35, 942 P.2d 736, CLEARY v. STATE
Discussed
 1998 OK CR 33, 965 P.2d 955, 69 OBJ 2028, Turrentine v. State
Discussed
 1998 OK CR 39, 964 P.2d 875, 69 OBJ 2421, Jackson v. State
Discussed at Length
 1998 OK CR 41, 963 P.2d 583, 69 OBJ 2672, Ochoa v. State
Cited
 1998 OK CR 62, 992 P.2d 332, 69 OBJ 3903, Young v. State
Discussed
 1998 OK CR 66, 973 P.2d 270, 69 OBJ 4283, Patton v. State
Discussed at Length
 1999 OK CR 15, 980 P.2d 1081, 70 OBJ 1223, Short v. State
Discussed at Length
 1984 OK CR 90, 688 P.2d 350, TOBLER v. STATE
Discussed at Length
 2000 OK CR 14, 8 P.3d 883, 71 OBJ 2063, Gilson v. State
Discussed
 1987 OK CR 103, 738 P.2d 525, JONES v. STATE
Discussed at Length
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2701, Opinion Testimony by Lay Witnesses
Discussed at Length
 12 O.S. 2801, Definitions
Cited
 12 O.S. 2803, Hearsay Exceptions - Availability of Declarant Immaterial
Discussed
 12 O.S. 2804, Hearsay Exception - Declarant Unavailable
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 644, Punishment for Assault and Battery
Cited
 21 O.S. 645, Assault, Battery, or Assault and Battery with Dangerous Weapon
Cited
 21 O.S. 701.7, Murder in the First Degree
Discussed
 21 O.S. 701.12, Aggravating Circumstances
Discussed at Length
 21 O.S. 701.13, Review of Death Penalty Sentence
Discussed
 21 O.S. 702, Design to Effect Death Inferred from Killing
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 2002, Disclosure of Evidence by State and Defendant - Duty of Disclosure - Time of Discovery - Regulation - Cost of Copying, etc.
Cited